**In re William J. STALLMAN, Debtor.**

**Bankruptcy No. ST95–82698.**

United States Bankruptcy Court,
W.D. Michigan,
Southern Division.

July 15, 1996.

Paul I. Bare, Traverse City, Michigan, for Debtor.

Dean E. Rietberg, Grand Rapids, Michigan, for United States Trustee.

## MEMORANDUM OPINION GRANTING U.S. TRUSTEE'S 11 U.S.C. § 707(b) MOTION TO DISMISS

JO ANN C. STEVENSON, Bankruptcy Judge.

Before the Court is the motion of the United States Trustee ("U.S. Trustee") to dismiss William Joseph Stallman's (hereinafter, "Debtor" or "Stallman") Chapter 7 bankruptcy case pursuant to 11 U.S.C. § 707(b). The basis of the U.S. Trustee's motion is the Debtor's lack of candidness and honesty in seeking Chapter 7 relief, and, primarily in light of the Debtor's allocation of approximately $771 per month to pay for his adult son's education and living expenses, the Debtor's lack of need for such relief. Having considered the briefs submitted by the parties and the evidence adduced at trial, the Court finds that the U.S. Trustee's motion is well taken and should be granted. Accordingly, Debtor Stallman shall have ten days from the date of this Opinion in which to voluntarily dismiss his Chapter 7 or convert his case to one under Chapter 13. In the event he does neither, the Court shall forthwith issue an order of dismissal.

1. The Debtor listed $475 as "school expenses," and $155 as "Subaru (son)." In addition, $188 was earmarked for auto insurance of which approximately $110 is attributable to Chas.

## JURISDICTION

The matter presented arises in a case referred to this Court by the Standing Order of Reference entered in this District on July 24, 1984; this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(J). Accordingly, the bankruptcy court is authorized to enter a final judgment subject to those appeal rights afforded by 28 U.S.C. § 158 in accordance with Fed.R.Bankr.P. 8001 and 8002.

The following constitutes the Court's findings of fact and conclusions of law as required by Fed.R.Bankr.P. 7052. In reaching its determinations, the Court has considered the demeanor and credibility of all witnesses who testified. All exhibits admitted into evidence have also been considered whether or not specifically referred to in this decision. In addition the Court has considered the briefs submitted by both counsel.

## BANKRUPTCY PROCEDURAL EVENTS

Mr. Stallman filed his Chapter 7 petition on May 31, 1995, electing to pay his filing fees in installments. In his initial Schedules I and J, he listed current net monthly income of $4,199 and current monthly expenses of $4,188, of which some $740 represented support of his adult child Charles (hereinafter, "Chas").[1] In his Amended Schedules I and J filed March 2, 1996, the Debtor listed current net monthly income of $4,051 against current net monthly expenses of $4,040, respectively.[2] Of those expenses $771.50 represented support of Chas.

The Section 341 First Meeting of Creditors was conducted on July 11, 1995. On July 17, 1995, Stallman reaffirmed the debt owed to land contract vendors Rosemary and David Fuller, and on July 18, 1995, Chapter 7 Trustee James W. Boyd filed his "no asset" report. On August 21, 1995, the Debtor stipulated to First of America's lift of stay as to the Debtor's 1990 Bayliner boat. On October 3, 1995, the Debtor was granted a discharge. On October 16, 1995, an Order of

2. Coincidentally, in each instance the Debtor stated that his monthly income exceeds his monthly expenses by about $11.00.

Final Decree was entered and the case was closed. As the discharge was entered as the result of an administrative error, the case was reopened and the discharge set aside pursuant to the Court's order of November 9, 1995.

The real business of this bankruptcy case, however, began on November 8, 1995, when the U.S. Trustee filed his Motion to Dismiss based on § 707(b) of the Code.[3] Debtor Stallman filed his response on December 11, 1995. On March 20, 1996, the U.S. Trustee filed his Amended Motion to Dismiss, and on March 21, 1996, the Debtor filed his Answer to Amended Motion as well as his Amended Schedules I and J.

After several adjournments, briefs in support and opposition were timely filed and considered, and the Trustee's § 707(b) motion was heard on May 9, 1996. At the conclusion of the May 9 evidentiary hearing, the Court ruled from the bench, advising that a written opinion would follow.

## FACTS

Stallman testified at the May 9, 1996 evidentiary hearing that, in addition to having a B.A. in computer science, he has completed graduate courses in that field. He has worked in the computer technology business for some thirteen years, the last nine as a computer consultant with Digital Equipment Corporation ("Digital") in Midland, Michigan. For the two years prior he worked at Sierra Health Services in Las Vegas, Nevada as a database administrator. Two years before that he worked as a systems analyst at Texas Instruments in Austin, Texas. In his current position with Digital he evaluates customer requirements and designs computer systems solutions.

On his May 31, 1995 Statement of Financial Affairs, Stallman listed his 1993 income as $64,760 and his 1994 income as $67,812. His 1995 year-to-date income (January 1, 1995 to May 31, 1995) was listed as $20,177.85. The Debtor testified[4] that for calendar year 1995, in addition to wages of $66,229, he also earned $6,264 from "independent consulting." Thus, his 1995 income totaled $72,493. He characterized his employment as stable, but stated that because of increased business travel, he would not be able to continue his freelance computer consulting work in 1996.

The Debtor opined that his financial problems resulted from his July 1993 divorce from Elizabeth Beckett, whom he had married in October 1973. At the time of the divorce, he and Elizabeth owed approximately $80,000 to their creditors. Of those debts $34,000 was owed to First of America Bank on a 1991 $37,000 boat loan, and $20,000 was owed for home improvement work financed by lines of credit with Comerica Bank and Household Finance. They also owed on Ms. Beckett's student loan as well as some $10,000 to Empire National Bank on her car. In addition, there was approximately $14,000 in credit card debt owed to Sears, MasterCard, and Visa. At the time of the divorce, Ms. Beckett was working and the couple was current on all payments. As part of the divorce agreement, the Debtor assumed all the outstanding marital debts except for the loan on Ms. Beckett's car. For the two years following the divorce he made interest only payments, failing to significantly reduce the principal on any of the installment debt.

Stallman explained that he filed Chapter 7 when, as a result of the sale of the marital home, he became liable for one-half of the $60,000 in capital gains tax liability. He tried to purchase a small condominium but was unable to qualify for a mortgage. Ultimately he was able to purchase a condominium on a land contract some five months

---

**3.** The U.S. trustee was required to its § 707(b) motion

> not later than 60 days following the first date set for the meeting of creditors held pursuant to § 341(a), unless, before such time has expired, the court for cause extends the time for filing the motion.

Fed.R.Bankr.P. 1017(e)(1). In this case, the U.S. trustee moved to extend time pursuant to Rule 1017 on September 8, 1995, a date within 60 days of the scheduled § 341 meeting. The Court granted the motion on September 13, 1995.

**4.** All references to testimony relate to the May 9, 1996 hearing.

before he filed bankruptcy.[5] Unable to provide land contract vendors David and Rosemary Fuller with a down payment, they devised a plan by which the Debtor, as land contract vendee, would rent out the condominium during the summer months, turning over the rental proceeds to the land contract vendors. These proceeds would be paid until the agreed upon $6,000 down payment was realized. In the summer of 1995, after filing Chapter 7, Stallman netted $4,700 from the rental of his condo which he turned over to the Fullers.[6]

Following the purchase of the condominium, the Debtor's monthly expenses were the highest they had been in the two years following his 1993 divorce. During this time Stallman spoke with his creditors about restructuring his debt, sought to consolidate his debt load, stopped using his credit cards, attempted to sell his boat, and incurred no new debt other than for the support of his adult son. He also visited several credit counselors who suggested filing bankruptcy. In late April or early May 1995, he sought bankruptcy advice from several attorneys. On May 31, 1995, he filed Chapter 7. Shortly after filing, the Debtor abandoned the boat to First of America Bank, and on July 31, 1996, he reaffirmed the land contract payments owed to the Fullers on his condo.

## DISCUSSION

The U.S. Trustee has moved to dismiss the Debtor's Chapter 7 for "substantial abuse" under 11 U.S.C. § 707(b). That section reads:

11 U.S.C. § 707. Dismissal

 * * * * * *

(b) After notice and a hearing, the court, on its own motion or on the motion of the United States Trustee, but not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor.

For the U.S. Trustee to prevail on a Section 707(b) motion, it must first be shown that a debtor's obligations are primarily "consumer debts." In this case the Debtor's schedules list the following secured debts: $78,000 on the land contract, $7,500 on a Subaru, some $10,000 on a 1992 Ford, and $34,000 on the 1990 Bayliner Boat. Priority debt includes current property taxes of $480 and withholding taxes of $3,638, the latter to be remitted to the IRS under a 1994 tax repayment installment agreement. In addition to these debts, the Debtor seeks to discharge $45,652 in unsecured debt. The parties have stipulated that the Debtor's debts are "primarily consumer debts" for § 707(b) purposes.

■ The issue is whether granting this Debtor a Chapter 7 discharge would constitute a "substantial abuse" of the provisions of the bankruptcy system. The term "substantial abuse" is not defined in the Code. However, the Sixth Circuit annunciated a "totality of the circumstances" test for determining when a § 707(b) motion should be granted. In *In re Krohn*, 886 F.2d 123 (6th Cir.1989), the Court stated that

[A] court should ascertain from the totality of the circumstances whether [the debtor] is merely seeking an advantage over his creditors, or instead is 'honest,' in the sense that his relationship with his credi-

---

5. It appears that Mr. Stallman was able to take advantage of the capital gains "exemption" afforded certain homeowners. This tax advantage applies when a homeowner is able to purchase a new home of equal or greater cost than the amount of the gain the homeowner realized from the sale of a previous home. In order to qualify for the tax deferment, the taxpayer must purchase the new home within two years of the sale of the previous home. *See* 26 U.S.C. § 1034. The Court draws this assumption based on Mr. Stallman's testimony that "he continued to defer

capital gains liability" (Transcript, at 15), as well as on the fact that no debt for capital gains taxes appears on Amended Schedule J.

6. *See*, Transcript, at 18–19. We understand "net" to mean the amount the Debtor was able to turn over to the land contract vendors as the necessary down payment on the condo, after deducting the living expenses he incurred while living in an apartment during that time.

tors has been marked by essentially honorable and undeceptive dealings, and whether he is 'needy' in the sense that his financial predicament warrants the discharge of his debts in exchange for liquidation of his assets.

*Krohn,* 886 F.2d at 126. *Krohn* makes clear that "substantial abuse can be predicated upon either lack of honesty or want of need." *Id.* While greatly troubled by the significant portion of this Debtor's monthly disposable income allocated to support and tuition for his adult son, the U.S. Trustee also points to instances tending to show that this Debtor is non-needy and may be dishonest.

### a. Does the Debtor "Need" Chapter 7 Relief?

 At the outset, we are instructed that the appropriate manner in which to analyze whether the Debtor is in "need" of Chapter 7 protection is to ascertain whether the debtor has the "ability to repay his debts out of future earnings." *Krohn, supra,* at 126. A debtor's lack of need alone may support a § 707(b) dismissal. *Id.* In its assessment of "need," a court's task is to hypothesize the debtor's filing a Chapter 13 and then to apply the "projected disposable income" test of § 1325(b)(2). *See, Id.; In re Walton,* 866 F.2d 981, 985 (8th Cir.1989); *In re Kelly,* 841 F.2d 908, 914 (9th Cir.1988). If we find that the Debtor's future disposable income would permit him to repay his consumer debts within a reasonable time and with "relative ease," the Chapter 7 should be dismissed. *Krohn,* at 126.

The figures which appear on Amended Schedule J Current Expenditures and which are in contention can be divided into two groups: those expenses which directly relate

to the Debtor's support of Chas and those expenses which relate to the Debtor himself. The Court will analyze these expenditures separately.[7]

### 1. Expenses Relating to Debtor's Adult Son

Amended Schedule J ("Current Expenditures") reveals that Stallman makes monthly payments totaling $771.50 which directly relate to Chas. Those payments are designated as follows:

| | |
|---|---|
| Chas Medical Deductible +20% | $ 21.00 |
| Chas Dental Excess | 15.00 |
| Auto—Chas' Subaru | 155.00 |
| Credit Union | 95.00 |
| Payments for "supporting dependents not living at home"—Chas | 200.00 |
| Auto insurance—Chas | 110.50 |
| School Expenses—Chas | 175.00 |
| Total | $771.50 |

The testimony revealed that Chas is a twenty-year-old high school graduate currently enrolled at Northwestern Michigan College. He is studying computer science, English, and math, and working toward a general business degree. He lives in his own apartment located two to three miles from the College. As shown above, Stallman makes his son's car payment, and pays for his car insurance, tuition, and books. The "Credit Union" item refers to the Debtor's monthly payment on Chas' guitar.[8] Finally, he contributes $200 monthly toward Chas' living expenses.[9]

Chas works part-time at a restaurant located two to three miles from his home and the College. At that job, he earns $7.00 per hour. With this money, he pays a portion of his gas, food, clothing, and utility bills. He does not contribute toward either tuition or books.

7. The Court notes its unease with passing judgment on expenditures which represent a debtor's choice of lifestyle. *See, In re Gyurci,* 95 B.R. 639, 643 (Bkrtcy.W.D.Minn.1989) (collects § 707(b) cases wherein courts were called upon to determine whether expenditures on cigarettes, church, charities, and private school education were "reasonably necessary"). We agree with Judge Dreher, however, that by failing to define the term in the Code, Congress left to judges the task of developing the parameters of "substantial abuse." *Id.* To make determinations as to whether the Debtor's expenditures are "reason-

ably necessary" is to perform an unfortunate but essential task. *See also, Krohn, supra,* at 128, n. 2.

8. The testimony revealed that the Debtor has either made the last $95 payment or will soon do so. In any event this $95 per month may now be considered part of the Debtor's disposable income.

9. Although the Debtor explained many of the expenditures listed on his Amended Schedule J, he did not address this last item.

The testimony as to Chas' health was helpful, even though contradictory. According to the Debtor, although his son's health is good, certain "reconstruction measures ... have to be taken as a result of his birth defect." Transcript, at 46. The birth defect was explained as a cleft palate and cleft lip which might require future dental work and plastic reconstruction surgery. However, according to Elizabeth Beckett, Chas' mother and the former Mrs. Stallman, because of his age, it was highly unlikely that Chas would need additional surgery. In any event, no evidence was presented that Chas either was ill or disabled such that he was dependent upon his father's financial help and thus unable to pay his own way through college whether by working or taking out student loans. In fact, quite the contrary seemed evident from Ms. Beckett's testimony. She explained that she could not help Chas with his college education because, as her job pays only one dollar more per hour than Chas', she did not have the financial means. She added, however, that

> He (Chas) has other resources. He has other means. He has student loans. He has PAL (sic) grants. He has every option. I have tried to assist him with this but my ex-spouse blocked that.

Transcript, at 63.

We do not question the sincerity of the Debtor or of Ms. Beckett in their belief in the importance of a college education in today's society. To this end, the Debtor testified,

> It had always been our joint intention to provide a college education for our son and when I assumed full responsibility or sole responsibility for him following the divorce, that [sic] it became my sole responsibility. I never considered college education a luxury. My wife and I both struggled to achieve a college education because it was required in order to support a decent standard of living in today's world. I don't think you will find very

many people who would argue to the contrary.

Transcript, at 37. The Court would echo the Debtor's views. And were this a Chapter 13 case we might well allow a portion of the disputed expenditures relating to Chas' education. See, e.g., In re Killough, 900 F.2d 61, 66 n. 10 (5th Cir.1990); In re Gonzales, 157 B.R. 604, 610–11 (Bkrtcy.E.D.Mich.1993) (Spector, J.). This would be especially true if Chas were the Debtor's "dependent," which may or may not be the case here.[10] The Court is convinced, however, that Chas' college education should not be wholly financed by the Debtor's creditors, especially when no compelling reason to do so has been produced other than that such expenditures are the Debtor's personal choice. See, In re Gyurci, supra, at 643. Indeed, many of the disputed expenditures are simply not "reasonably necessary," but instead are those which "can be reduced significantly without depriving [the Debtor] of adequate food, clothing, shelter, and other necessities." Krohn, at 127.

For example, the Court would point to the lack of testimony as to why Chas could not live with his father and thus save the additional expenses necessitated by contributing to another household. The record simply does not justify Chas' dependence upon his father for his living expenses. Ms. Beckett's testimony that there were other options available to Chas was undisputed and compelling. Thus, deducting all but the tuition and books expenses included in the Debtor's monthly budget attributable to Chas' support, an additional $600 per month of "disposable income" would be available to pay creditors.[11] Over a hypothetical 36–month Chapter 13 plan some $21,600 could be disbursed, a not insubstantial sum.

The Court must make clear that it need not hold, and does not so hold in this case, that educational and support expenditures for adult children in Chapter 13 cases are

---

10. Stallman claimed Chas as a dependent on his 1995 tax returns. Defendant's Exh. # 1. However, whether or not a debtor is under a legal obligation to care for a child is not the only test for a child's status as a "dependent." See, Gonzales, supra, at 609–11.

11. We have not deducted the $36 a month for medical and dental which we understand the Debtor must pay pursuant to a Circuit Court order. Even if these expenses were not required by court order, we would likely find it reasonable for this Debtor to pay them.

never allowable. While, as discussed above, the disputed expenditures relating to Chas go far beyond what may be termed "reasonably necessary," we are persuaded that, considering the totality of the circumstances in this case, it is the Debtor's *overall conduct* as further discussed below—his lack of need as well as his lack of candor and honesty—which compels today's ruling that to grant this Debtor a discharge would constitute a "substantial abuse" of the bankruptcy system.

### 2. Expenses Relating Solely to the Debtor

In addition to those expenses allocated to Chas, we question the following:

| | |
|---|---|
| Clothing (3 suits at $300.00 each plus street clothes) | $105.00 |
| Charitable Contributions (Church) | 44.00 |
| Installment Payments Auto (Ranger) | 263.00 |
| | $412.00 |

As to the clothing expense, it is not reasonable that the Debtor's budget should provide for three new suits per year at a cost of $300 each. While we understand and recognize that he may well be expected to look presentable in his employment, there was no testimony as to why looking presentable requires three new suits annually. If, in fact, the Debtor has been buying three new suits a year as his bankruptcy budget implies he has, absent a radical change in men's fashion or the destruction of his wardrobe by fire, flood, or some other disaster, his current wardrobe should be more than adequate. Accordingly, this monthly budget item should be reduced to $65.

Nor do we understand why the Debtor should be purchasing a pickup truck at a monthly expense of $263 in addition to leasing a car from Digital for $346 monthly. Upon cross-examination Stallman offered that he drives the Ranger "when I need a pickup truck or when my company vehicle is not available." Transcript, at 44. No explanation was offered as to why his company

vehicle would ever be unavailable. And, should he need a truck for a special purpose the financially responsible solution would be to rent one. Accordingly, we would reduce Debtor's monthly expenses by an additional $263.

As for the monthly charitable deduction of $44, there are methods of contributing to church and charity other than by making cash payments. Rather, in today's computer-dominated society, we would expect that this Debtor's computer expertise might well be even more helpful than a monthly cash payment. Or perhaps, he could donate his time doing maintenance or cleaning, services for which a church or charity might otherwise have to pay.[12] That expense should also be cut.

These monthly budget reductions would provide additional monthly disposable income of $347. Based on these more reasonable figures, additional disposable income of $12,492 would be available over the life of a three-year Chapter 13 plan.

### 3. Potential Additional Income

Among the factors the Court should consider in assessing a Chapter 7 debtor's "need" for relief is whether he enjoys a stable source of income. *Krohn, supra,* at 126. It is undisputed that Debtor Stallman's income is quite stable, and in fact, he expects it to rise. Moreover, he has demonstrated an ability to supplement his salary with substantial outside income.

In addition to his 1995 salary of $66,229, Mr. Stallman earned some $6,264 as an "independent consultant." We approach with skepticism his uncorroborated testimony that his current work travel schedule precludes him from earning extra income in this manner. However, even accepting that testimony at face value, we feel compelled to remark that in the past, the Debtor has ingeniously found other ways to earn additional income.

---

**12.** We note that there is a spate of bankruptcy cases which deal with church contributions, *Christians v. Crystal Evangelical Free Church (In re Young),* 82 F.3d 1407 (8th Cir.1996) being the most recent. In *Christians* the Eighth Circuit addressed the conflict between the Bankruptcy Code and the Religious Freedom Restoration Act, within the concept of recovery of fraudulent transfers. That case held that the latter trumps the former. Because fraudulent transfer claims have not been brought here, however, we need not address the *Christians* ruling.

We specifically refer to the manner in which he was able to finance the purchase of his condominium following the sale of the marital home.[13] By renting out the condo during the summer months of 1995, the Debtor testified that he was able to net $4,700. The downpayment on the condo having been paid, no testimony was introduced which would indicate that this option is not still available. And, while the Court would be most reluctant to unilaterally suggest that the ordinary debtor take such a step, we are less so where, as here, a debtor has volunteered to do so on his own behalf, and where the issue is one of "projected disposable income." Pursuing such a course of action for three summers under a three-year Chapter 13 plan would provide another $14,100 in disposable income.

In conclusion, a Debtor who, with a little "belt tightening," could make a total of some $45,000 available over three years to pay unsecured debts—debts listed on his schedules at $45,562—cannot and will not be adjudged in "need" of Chapter 7 relief.[14] *See, Krohn, supra,* at 128; *Wilson v. United States Trustee (In re Wilson),* 125 B.R. 742, 746 (W.D.Mich.1990). Indeed, he appears to be one who can repay his debts with "relative ease" out of future disposable income. *Krohn,* at 126.

### b. Is this Debtor Honest?

When a § 707(b) motion has been filed, in addition to an assessment of a debtor's "need" for Chapter 7 relief, *Krohn* instructs courts to assess whether a debtor is honest, "in the sense that his relationship with his creditors has been marked by essentially honorable and undeceptive dealings." *Krohn, supra,* at 126. Among the factors which should be considered concerning a debtor's honesty are:

—the debtor's good faith and candor in filing schedules and other documents;

—whether the debtor engaged in "eve of bankruptcy purchases"; and,

—whether the debtor was forced into Chapter 7 by unforeseen or catastrophic events.

*Id.*

This Debtor has failed the honesty test. To begin with, although requested to do so, Debtor Stallman still has not filed an Amended Schedule I reflecting his 1995 consulting income or the summer rental income from his condo. Without that document, the Court cannot determine how much, if any, of that additional income was earned before he filed bankruptcy on May 31, 1995. Nor has Stallman complied with this Court's April 26, 1996 order requiring that he forthwith pay the alimony arrearage which he owes Ms. Beckett, and that he commence making the $500 monthly alimony payments. Although he had made the May 1, 1996 payment by the time of the May 9, 1996 hearing, he failed to make any payment on the arrearage. To make matters worse, he listed the $500 monthly alimony payment as an expense on Schedule J but never made a payment to Ms. Beckett until ordered to do so in the April 26 order. Prior to that date, he escrowed five of the alimony payments owed. Then, he took those funds and applied them to his land contract debt. The U.S. Trustee said it well:

> The debtor improved his equity position in his Grand Traverse Resort condominium by $2,500 at the expense of his creditors under the budgetary guise of making regular alimony payments.

U.S. Trustee's May 3, 1996 Memorandum, at 5.

This Debtor's acts amount to an overall lack of good faith and candor in filing his Chapter 7 documents.

Addressing the issue of possible "eve of bankruptcy purchases," the Debtor's condo transaction, while consummated only five months before he filed, does not qualify as such a purchase. The Court sees the benefit of taking advantage of the capital gains deferment; had the Debtor not bought a home in 1995 he would have faced a tax liability of

---

**13.** As discussed *infra,* the Court does not consider the acquisition of the condominium an "eve of bankruptcy" purchase. *See, infra,* Discussion, Section b.

**14.** Applying the expense reductions discussed *supra* would result in $48,000 of disposable income over three years. Subtracting the Chapter 13 Trustee's commission of 6.04 percent or $3,100, reduces that figure to $44,900.

approximately $8,400 from the 1993 sale of the marital home.[15] Further, it appears the Debtor made significant good faith efforts to buy an affordable home. And, it appears that well before he filed bankruptcy, the Debtor sought to work out his financial difficulties with some of his creditors, received credit counseling, and stopped incurring new debt. Nevertheless, as explained below, although the Debtor made no "eve of bankruptcy purchases," he is someone who, over the years, has taken on more debt than he can afford as a matter of course.

The Court looks darkly on the Debtor's explanation that his financial difficulties resulted from a catastrophic event, to wit, his 1993 divorce from Elizabeth Beckett. We might have accepted his view but for Ms. Beckett's uncontested testimony. She explained that the Debtor's financial problems were ongoing, that the couple had gone through "eight years of therapy to deal with this," and that "he always had a thirst to live beyond his means." Transcript, at 50. Her further testimony as to the Debtor's failure to cooperate in the sale of the Bayliner boat which they could not afford, his Christmas gift to her, and his purchase of the Ranger, all support the Court's conclusion that Stallman has habitually lived beyond his means at the expense of others. *See,* Transcript, at 49–53; *See also, Krohn, supra,* at 127. Ms. Beckett was a credible witness.[16]

Although Debtor Stallman has significant I.R.S. liability, this liability was incurred when he voluntarily changed his withholding and ended up owing income taxes. The Debtor and the I.R.S. subsequently entered into an agreement by which the $3,638 owed would be paid in monthly installments of $650. Again, this can hardly be termed an unforeseen or catastrophic event. Rather, it appears to have been a part of the Debtor's financial and budgetary plan.

Based on all the testimony before us, we conclude that the Debtor has been less than forthcoming as to his financial affairs vis á vis his bankruptcy filing and was not forced into Chapter 7 by any unforeseen or catastrophic event. Under these circumstances the Court finds that Debtor Stallman cannot be considered honest for § 707(b) purposes.

**CONCLUSION**

The Sixth Circuit's *Krohn* case guides the Court in assessing whether, under the totality of the circumstances, a Chapter 7 debtor's case should be dismissed for "substantial abuse" under § 707(b).

William Stallman does not belong in Chapter 7. We cite the Debtor himself:

I don't have any doubt that it's my responsibility to repay the money that we (he and the former Ms. Stallman) borrowed. But I don't have a way that I know of to make that happen. If anyone—I always said that if anyone has a suggestion, tell me how I can work my way out of this, I'm eager to work on it, but I don't know of a way.

Transcript, at 36. We would respond that with a little "old-fashioned belt tightening" the Debtor could easily fulfill his responsibilities to his creditors. As Debtor Stallman is both non-needy and lacking in honesty, the Trustee's Motion to Dismiss will be granted.

---

**15.** This figure is derived by multiplying $60,000 (the approximate amount of gain from the sale of the Debtor's former home) by .28 (the capital gains tax rate), and dividing by two, since the Debtor would share this tax burden with his ex-wife Ms. Beckett.

**16.** After the May 9, 1996 hearing but before the issuance of this Opinion, the Court received an unsolicited letter from Mr. Stallman. Other than an inadvertent glance at the last sentence on the first page, that letter was neither read nor considered. Only evidence properly brought before the court can be considered in deciding a factual dispute. Moreover, Fed.R.Bankr.P. 9003 prohibits such *ex parte* communications with the Court. Accordingly, a copy of that letter has been provided to the Office of the U.S. Trustee to take whatever action it deems necessary.