**In re Donald Louis MARS, Karen Alayne Mars, Debtors.**

### No. HM 05–90141.

United States Bankruptcy Court, W.D. Michigan.

March 28, 2006.

Robert T. Finkbeiner, Esq., Marquette, MI, for the Debtors.

Michael V. Maggio, Esq., Grand Rapids, MI, for the United States Trustee.

### OPINION RE: U.S. TRUSTEE'S MOTION TO DISMISS PURSUANT TO 11 U.S.C. § 707(b)

JEFFREY R. HUGHES, Bankruptcy Judge.

The United States Trustee ("UST") filed a motion to dismiss Mr. and Ms. Marses' Chapter 7 bankruptcy proceeding pursuant to 11 U.S.C. § 707(b).[1] An evidentiary hearing was held on February 8, 2006.[2] I

---

1. The Bankruptcy Code is set forth in 11 U.S.C. §§ 101–1532. Unless otherwise noted, all further statutory references are to the Bankruptcy Code.

The Marses' filed their bankruptcy petition before the October 17, 2005 effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), Pub.L. No. 109–8, § 1501, 119 Stat. 80, 216.

Nonetheless, citations to the Bankruptcy Code reflect the BAPCPA amendments unless noted otherwise.

2. Ms. Mars testified at the hearing as did Ms. Colleen Olson and Ms. Mary K. Viegelahn Hamlin. UST's Exhibits 1 through 10 were admitted into evidence as was Debtors' Exhibit A.

took the matter under advisement after closing arguments.

### FACTUAL BACKGROUND

Donald and Karen Mars live in Grand Marais, Michigan. Grand Marais is on the rural southern shore of Lake Superior in Michigan's upper peninsula. Its permanent population is fewer than 500. The nearest towns of any size are Newberry, which is 50 miles east, and Munising, which is 60 miles west.

Mr. Mars is retired. He receives social security but is also employed part-time. His monthly earnings, net of taxes, is $1,475.

Ms. Mars is a minister who serves three separate congregations in the vicinity of Grand Marais. A typical Sunday requires her to drive approximately 90 miles to fulfill her calling. Ms. Mars earns $1,909.00 per month, net of taxes. Her congregations also provide a parsonage at no cost. Ms. Mars estimates that the fair rental value of the parsonage is $400 per month, excluding utilities.[3] Therefore, Mr. and Ms. Marses' combined income, inclusive of the housing subsidy, is approximately $3,800 per month.

Ms. Mars' employment in Grand Marais will end in July 2006. It is likely that she will be transferred to serve another church in Michigan. Ms. Mars expects that her annual salary will increase by $1,000 if she is transferred. However, she also testified that her husband's supplemental income from part-time employment will be lost if she accepts the transfer. There was no testimony as to what, if any, impact a transfer would have on the Marses' living expenses. For example, it is unknown whether Ms. Mars' future congregation will provide her a parsonage.

Ms. Mars is 64 years old. She is eligible for retirement in March of 2007 and she is subject to mandatory retirement at the age of 70. Ms. Mars would like to retire when she becomes eligible. However, her commitment to her new church and her own financial circumstances may not allow her to retire at that time. Ms. Mars' health may also determine when she retires. She has a chronic health problem that periodically causes serious maladies, the most recent having occurred last November. Ms. Mars did not offer any information as to what income she would expect to receive if she were to retire.

Mr. and Ms. Mars indicated in their Schedule J filed with the court at the inception of their proceeding that their combined monthly expenses were $3,384. In other words, their monthly expense equaled their monthly cash earnings. However, Ms. Mars testified at the trial without contradiction that her actual unreimbursed business expenses in 2005 averaged $218.50 per month as opposed to the $30 per month originally set forth in her Schedule J.[4]

The UST nonetheless contends that the Marses could fund a Chapter 13 plan which would generate over a 36 month period a $5,800.00 dividend for the Marses' unsecured, non-priority creditors. He argues that the Marses could take advantage of a number of Chapter 13 devices to create some of the necessary disposable income to accomplish this feat. For example, the UST asserts that Ms. Mars could

---

3. Neither party offered proofs as to the average cost of the parsonage's utilities.

4. Ms. Mars also testified without contradiction that she had significant medical and dental needs that will require attention in the immediate future and that the unreimbursed cost of her prescription drugs is $200 per month. However, it appears that these health costs have already been included in the $600 per month the Marses have budgeted for medical and dental expenses in their original Schedule J.

reduce the payments on her automobile by "cramming down" the secured creditor's lien under a Chapter 13 plan. 11 U.S.C. §§ 506 and 1325(b)(2).

The UST also contends that the Marses should practice some modest "belt tightening." Colleen Olson and Mary Viegelahn Hamlin both offered expert testimony on behalf of the UST.[5] Both opined that the Marses' budgeted expenses were excessive for a family of two living in Grand Marais, Michigan. The UST suggests that the Marses could eliminate $130 per month in their budget and still provide for their reasonable maintenance and support. He argues that this savings could be realized by eliminating $50 per month in life insurance premiums on two whole life policies and $80 per month for cards and gifts for the Marses' twelve children and eighteen grandchildren.[6]

### DISCUSSION

The Marses' Chapter 7 proceeding was commenced prior to the effective date of the recent amendments to the Bankruptcy Code. Therefore, the UST's motion is to be decided based upon the prior enactment of Section 707(b).

> (b) After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, but not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor. In making a determination whether to dismiss a case under this section, the court may not take into consideration whether a debtor has made, or continues to make, charitable contributions (that meet the definition of "charitable contribution" under section 548(d)(3)) to any qualified religious or charitable entity or organization (as that term is defined in section 548(d)(4)).

11 U.S.C. § 707(b) (repealed).

The Marses' agree that their debts are primarily consumer debts. However, they contest the UST's assertion that the Chapter 7 relief they are requesting is a "substantial abuse" of that chapter.

The Sixth Circuit first addressed former Section 707(b) in *In re Krohn*, 886 F.2d 123 (6th Cir.1989). It concluded that "substantial abuse" could arise either because the debtor was dishonest in his relationship with his creditors or because the debtor's financial circumstances, or "need," did not warrant the relief afforded by Chapter 7. *Id.* at 126.

The UST argues that "want of need" can be established through the application of a single objective test: are Mr. and Ms. Mars capable of proposing a Chapter 13 plan that would pay a significant amount to unsecured priority creditors? If the answer is yes, then the UST contends that the court must find substantial abuse under Section 707(b) without further consideration.

The UST cites *Krohn* as the source for this proposition. However, *Krohn* cannot be so broadly read. The Sixth Circuit did say in *Krohn* that a debtor's "ability to repay his debts out of future earnings" is among the factors to be considered in de-

---

**5.** Ms. Olson is the Chapter 7 trustee appointed to administer the Mars' bankruptcy estate. Ms. Hamlin is a Chapter 13 trustee for this district. However, Ms. Hamlin does not administer any cases involving debtors residing in the upper peninsula.

**6.** Mr. and Ms. Marses' marriage is a second marriage for both. Their children and grandchildren live throughout the continental United States.

ciding whether a debtor is needy. *Id.* Moreover, the Sixth Circuit later observed that "one way courts determine a debtor's ability to pay is to evaluate whether there would be sufficient disposable income to fund a Chapter 13 plan." *In re Behlke,* 358 F.3d 429, 435 (6th Cir.2004). However, in neither of these cases did the Sixth Circuit in fact dismiss the debtor's Chapter 7 proceeding simply because the debtor could propose a viable Chapter 13 plan.

For example, in *Krohn,* the Sixth Circuit did find that Mr. Krohn would have "ample future income" if he and his wife constrained themselves to a reasonable budget. However, the court also relied upon its determination that Mr. Krohn's financial situation was not "the product of any unforeseen or catastrophic event" and that Mr. Krohn had engaged in "a catalogue of excess after the petition was filed." *Krohn,* 886 F.2d at 128. And in *Behlke,* the Sixth Circuit considered not only the fact that "debtors had the ability to pay their creditors out of future income to the tune of $634.00 per month," *Behlke,* 358 F.3d at 436, but also that Mr. Behlke's income was stable and that there was no evidence that the Behlke's financial problems were the consequence of a catastrophic or unforeseen event. *Behlke,* 358 F.3d at 436–437.

■ Moreover, I cannot ignore either the plain language of former Section 707(b) or the balance of the Sixth Circuit's effort to interpret it. Granted, Congress did not define "substantial abuse" when it enacted former Section 707(b). However, the absence of a definition does not mean that the courts have been given an open license to simply fill in the blank. Courts typically give words their ordinary, contemporary meaning when interpreting a statute. *In re Perrin,* 444 U.S. 37, 42, 100 S.Ct. 311,

62 L.Ed.2d 199 (1979). The noun "abuse," as used in this context, commonly means "improper use" [7] and the adjective "substantial" commonly means "being that specified to a large degree ..." such as a "substantial lie." [8] Consequently, it is fair to infer from former Section 707(b) itself that dismissal under that subsection requires not only that there be an improper use of the provisions of Chapter 7 but also that the improper use be of sufficient degree as to be characterized as substantial.

This common meaning clearly was not lost on the Sixth Circuit when it decided *Krohn.*

> In essence, § 707(b) allows a bankruptcy court to deal equitably with the **unusual** situation where an **unscrupulous** debtor seeks to enlist the court's assistance in a scheme to take unfair advantage of his creditors; it serves notice upon those tempted by **unprincipled** accumulation of consumer debt that they will be held to at least a rudimentary standard of fair play and honorable dealing.

*Krohn,* 886 F.2d at 126 (emphasis added).

■ Therefore, the formulaic approach the UST advocates is questionable on its face. The ability of a debtor to fund a Chapter 13 plan is certainly evidence of a debtor's improper use of a Chapter 7. Likewise, the extent to which a debtor is able to fund a Chapter 13 proceeding may indeed be sufficient in and of itself to evidence a substantial misuse of Chapter 7. However, as the Sixth Circuit observed in *Krohn,* whether a debtor truly needs Chapter 7 relief ultimately must turn on the "totality of the circumstances." *Id.*

> In determining whether to apply § 707(b) to an individual debtor, then, a court should ascertain from the totality of the circumstances ... whether he is

---

7. Webster's Ninth New Collegiate Dictionary.

8. Webster's Ninth New International Dictionary (Unabridged).

"needy" in the sense that his financial predicament warrants the discharge of his debts in exchange for liquidation of his assets.

*Id.*

The recent enactment of BAPCPA also offers clues as to what Congress meant when it previously added "substantial abuse" as a basis for dismissing a Chapter 7 case. Section 707(b) under BAPCPA now presumes that "abuse" exists whenever the debtor's disposable income exceeds a specified budget based largely upon Internal Revenue Service standards. 11 U.S.C. § 707(b)(2). Consequently, it follows that a "substantial abuse" would now exist only when the debtor's disposable income substantially exceeds the Section 707(b) budget mandated by BAPCPA. In other words, if under the new Section 707(b) a debtor's Chapter 7 is presumed abusive if the debtor's monthly income exceeds the debtor's proscribed monthly budget by $166.00,[9] then some multiple of that difference must exist in order for the abuse to be deemed substantial.

The UST's method for determining whether a debtor is capable of proposing a Chapter 13 plan is also suspect. The UST relies upon *In re Stallman,* 198 B.R. 491 (Bankr.W.D.Mich.1996).

> In its assessment of "need," a court's task is to hypothesize the debtor's filing a Chapter 13 and then to apply the "projected disposable income" test of § 1325(b)(2). If we find that the Debtor's future disposable income would permit him to repay his consumer debts within a reasonable time and with "rela-

tive ease," the Chapter 7 should be dismissed.

*Id.* at 496 (citations omitted).

*Stallman* does indeed state how the alternative relief afforded by Chapter 13 is to be integrated into consideration of whether the debtor's Chapter 7 petition constitutes a substantial abuse. However, the UST's suggested application of this concept is faulty for two reasons. First, the UST forgets that the "projected disposable income" test of Section 1325(b)(2) is not an absolute requirement for confirmation of a Chapter 13 plan. Rather, Section 1325(b)(2) applies only if the Chapter 13 trustee or the holder of an allowed unsecured claim objects to confirmation. 11 U.S.C. § 1325(b)(1). Therefore, Section 1325(b)(2) is relevant for purposes of determining whether there has been a substantial abuse under former Section 707(b) only if the hypothetical posited by the UST includes the assumption that the Chapter 13 trustee will always object to any plan that does not meet the Section 1325(b)(2) standard.[10] However, that assumption is not well founded, for Section 1325(b)(1) implicitly leaves some discretion on the part of the Chapter 13 trustee not to object. Ironically, consideration of the totality of the debtor's circumstances would in all likelihood drive the hypothetical Chapter 13 trustee's decision to exercise that discretion.

Second, and more important, the UST ignores the fact that determination of disposable income under Section 1325(b)(2) is not a static process. In other words, whether a debtor has disposable income in a hypothetical Chapter 13 proceeding

---

**9.** Whether abuse is to be presumed is actually the function of a grammatically-challenged formula set forth in new Section 707(b)(2). The referenced $166.00 threshold assumes that the debtor's unsecured, non-priority debt is greater than $40,000.00.

**10.** Unsecured creditors seldom object to confirmation based upon Section 1325(b). Therefore, the UST's hypothetical must rely upon the assumption that the Chapter 13 trustee will always be the one to raise the Section 1325(b) objection.

cannot be determined simply by taking the debtor's net income as set forth in Schedules I and J and then adjusting it for whatever line items appear excessive. Ms. Hamlin, the Chapter 13 trustee who testified at the hearing, agreed that line item adjustments are appropriate only if the overall budget is excessive. As Ms. Hamlin put it, a debtor may eat steak provided allowances are made elsewhere in the budget. It follows then that a debtor may also create disposable income by making allowances elsewhere in his budget. Consider, for example, a debtor who chooses to live in a one-room apartment and to eat macaroni and cheese to save for the later purchase of a car. Is that debtor abusing the process unless he commits the savings to his creditors instead? If the answer is yes, is the debtor prohibited from thereafter revising his budget to a more accommodating two-room apartment and an occasional meat and potato dinner? A debtor can also create "phantom" disposable income by underestimating one or more budgeted expenses. Indeed, Ms. Mars' uncontradicted testimony at trial was that she had underestimated her unreimbursed business expenses by over $180. Would the Chapter 13 trustee, or, more appropriately, the Bankruptcy Code, preclude the Marses from subsequently amending their Schedule I to correct this error? [11]

■ BAPCPA certainly has more than its share of detractors. However, Congress has at least better defined the circumstances under which a Section 707(b) dismissal is appropriate. Moreover, Congress has removed the court from the private lives of those who appear before it. Too many courts have fretted over whether a debtor's budget should include an allowance for cigarettes or whether the debtor is driving too expensive of a car. Far more important is consideration of what is to be the fair division of a debtor's future income between his creditors and himself. A debtor should not be permitted to live extravagantly at his creditors' expense. However, it should be up to the debtor to decide how he spends his share once the appropriate allotment has been made. For example, a debtor should not be prohibited from smoking provided the debtor makes compensating adjustments elsewhere in his or her budget.[12]

■ To summarize, I make these three observations with respect to substantial abuse under former Section 707(b). First, the court is not precluded from considering factors other than the ability to confirm a Chapter 13 plan when considering whether a debtor "needs" Chapter 7 relief. Second, a debtor's income must be significantly higher than the statutory budget now imposed by new Section 707(b) in order to constitute a "substantial abuse" under former Section 707(b). Third, the court's focus concerning the debtor's fair share of his future earnings should be

---

11. The May 23, 2005 scheduling order issued in connection with this contested matter restricts the Marses from amending their Schedule I for purposes of this hearing except for cause shown. However, the fact remains that Ms. Mars did offer testimony without objection that her actual business expenses were different from those set forth on her original Schedule I. Consequently, I am compelled to consider this information regardless of whether the May 23, 2005 order precluded the Marses from offering as evidence an amended Schedule I.

12. Indeed, eliminating, for example, cigarettes from the budget is silly. Government cannot suppress addictive behavior. Continued cigarette sales in the face of substantial excise taxes proves this point. Consequently, it is more likely than not that the "elimination" of cigarettes from a bankruptcy debtor's budget will mean only that food, housing, or some other budgeted expense will be further compromised to accommodate the debtor's habit.

more upon what a similarly situated person in the debtor's community needs in order to maintain himself and his dependents than upon how the debtor proposes to expend whatever is ultimately determined to be his fair allotment.[13]

■■ I am satisfied in the instant case that Mr. and Ms. Mars are not substantially abusing Chapter 7 by seeking a discharge under its provisions. I accept, for argument sake, the UST's assertion that the Marses could have proposed a Chapter 13 plan that would have distributed over five thousand dollars to their unsecured creditors with only about a 3% adjustment in their budget. However, the fact that Chapter 13 offers advantages to the debtor that Chapter 7 does not is not in and of itself proof of substantial abuse. In this instance, the advantages afforded to the Marses by a Chapter 13 are the ability to reduce their loan payments on account of Ms. Mars' car and the ability to reduce their payments to the IRS with respect to a pre-petition liability. Perhaps, in hindsight, the Marses should have filed a Chapter 13 proceeding. However, there is no requirement under the Bankruptcy Code that a debtor must select the bankruptcy chapter that maximizes the distribution to unsecured, non-priority creditors. Granted, both the IRS and the secured creditor whose car loan the Marses' reaffirmed stand to gain because of the Marses' decision to seek Chapter 7 relief instead of Chapter 13 relief. However, the relative allocation of a debtor's future income among his pre-petition creditors should not be confused with the fair allocation of the debtor's future income between what the debtor needs and what his creditors deserve.

Moreover, there are other factors that must be considered in the instant case with respect to the Mars' ability to pay their creditors. I give no weight whatsoever to the Marses' explanation for why they had to file for bankruptcy relief. The Marses were not forced into Chapter 7 because of a catastrophe or an unforeseen event. Rather, they find themselves in this unfortunate position simply because of the bad financial decisions they have made.

However, I do give weight to several other factors. First, Mr. Mars is retired and Ms. Mars is within five years of mandatory retirement. Second, Ms. Mars' chronic health problems may require her to retire earlier. Third, Ms. Mars will require significant dental and medical treatment within the immediate future. Fourth, there is no indication that the $400 housing subsidy the Marses are currently enjoying will continue when the Marses leave Grand Marais this July.

These additional factors cast doubt upon whether the Marses will in fact enjoy "a stable source of future income" sufficient to maintain themselves and also repay something to their creditors. *See, Krohn,* 886 F.2d at 126. Indeed, such factors are especially important given that a debtor is presumed not to have engaged in substantial abuse under former Section 707(b).

■ The UST contends that Chapter 13 is capable of addressing the uncertainty of the Marses' future finances through post-confirmation plan amendments or even a hardship discharge under Section 1328(b). However, the UST misses the point. The question is not whether Chapter 13 is suitable for the Marses. Rather, the question is whether the Marses should be denied the right to choose the bankruptcy chapter

---

**13.** I have characterized what a debtor's fair allotment should be the same as what a similarly situated person in the debtor's community would need to live a comfortable, but modest lifestyle. In effect, this is the same approach as that adopted by Congress when it recently revised Section 707(b). The difference is only in how the appropriate allotment is determined.

that they believe is most suited for them. Section 707(b) circumscribes that choice. However, it does not eliminate the choice altogether.[14]

In closing, it is worth stepping back and considering the phrase "substantial abuse" in its own right. The absence of any direction from Congress with respect to former Section 707(b) has compelled many courts to reduce the concept to a checklist or to even a mathematical formula. However, the phrase defies such efforts. At a minimum, substantial abuse connotes conduct beyond just misbehavior. Indeed, the phrase suggests conduct or circumstances that would so shock the court as to make the debtor undeserving of Chapter 7 relief. There is nothing in the instant case that suggests the Marses' conduct or circumstances rises to this level. They are an elderly couple who live in a remote area of Michigan. Their lifestyle is not extravagant. They are simply managing as best they can as Ms. Mars struggles with her health and her job demands. A general impression, of course, should not supplant the methodical approaches utilized by courts when enforcing former Section 707(b). However, a "gut reaction" does serve as a litmus test for determining whether the methodology is being applied correctly.

## CONCLUSION

Therefore, for the reasons set forth herein, the United States Trustee's motion to dismiss Mr. and Ms. Marses' Chapter 7 proceeding is DENIED. A separate order will enter consistent with this opinion.

**14.** As already discussed, Congress has now defined "abuse" under new Section 707(b) as including circumstances when a debtor's income exceeds a budget largely dictated by IRS standards. Ms. Hamlin, in response to a question I asked her, testified that the Marses' "means test" budget under new Section 707(b) would be $2,619. Therefore, an inference could be drawn that the Marses are in fact substantially abusing the bankruptcy process given that their current monthly income, inclusive of the rent subsidy, exceeds this budget by nearly $1,200.

However, I choose not to draw that inference. First, it appears that the Marses' total annual income ($45,600) is less than the highest median family income for Michigan ($48,-253) even when their housing subsidy is included. Therefore, it is unlikely that the "means test" budget would apply even if the Marses had filed their petition post-BAPCPA.

11 U.S.C. § 707(b)(7). Second, it is unclear whether and how Ms. Hamlin factored Ms. Mars' unreimbursed business expenses and medical expenses into her calculation of the "means test" budget. *See,* 11 U.S.C. § 707(b)(2)(a)(ii)(I). I did give both the UST and the Marses the opportunity to ask follow-up questions when I put my question to Ms. Hamlin. However, neither took advantage of that opportunity. Therefore, while the Marses' current monthly income might in fact be well in excess of what would be presumed to be abusive under new Section 707(b) if the "means test" budget offered by Ms. Hamlin were to be used, there is not enough in the record to substantiate Ms. Hamlin's calculation of that budget. That the Marses are also presumed under former Section 707(b) not to have abused Chapter 7 when they chose to file their petition also militates in favor of not drawing this inference.