**In re Christopher C. BLUM,
Lisa L. Blum, Debtors.**

**Bankruptcy No. 99–16973.**

United States Bankruptcy Court,
S.D. Ohio,
Western Division.

Sept. 15, 2000.

---

James C. Frooman, Lindhorst & Dreidame Co., Cincinnati, OH.

Eileen K. Field, Harris Harris Field Schacter & Bardach, Cincinnati, OH.

## MEMORANDUM OF DECISION

JEFFERY P. HOPKINS, Bankruptcy Judge.

Presently before the Court is a motion to dismiss (Doc. 17) for substantial abuse pursuant to 11 U.S.C. § 707(b) filed by the United States Trustee. The Blums filed a response (Doc. 20) and a hearing was held on April 27, 2000. Based upon the following findings of fact and conclusions of law, made pursuant to Fed.R.Civ.P. 52(a), the Court concludes that the motion should be granted.

### I

Section 707(b) provides in material part: After notice and a hearing, the court, on ... a motion by the United States Trustee ... may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor.

A review of the schedules reflects that the Blums' debts are primarily, if not exclusively, consumer debts. See 11 U.S.C. § 101(8). Accordingly, the sole issue before the Court is whether the grant of relief to the Blums under Chapter 7 would constitute a "substantial abuse."

The term "substantial abuse" is not defined by the Bankruptcy Code. The Sixth Circuit has construed the term to mean a lack of either honesty or need. In re Krohn, 886 F.2d 123, 126 (6th Cir.1989). Courts have found it easier to define and identify a lack of honesty as opposed to a lack of need. See In re Beles, 135 B.R. 286, 288 (Bankr.S.D.Ohio 1991) (Perlman, J.); see also In re Attanasio, 218 B.R. 180 (Bankr.N.D.Ala.1998) (identifying numerous ambiguities arising within the context of needs based analysis). In this case, the record contains ample evidence of the Blums' lack of honesty.[1]

The honesty analysis under § 707(b) looks to a debtor's relationship with creditors and whether it has been marked by essentially honorable and undeceptive dealings or whether the debtor merely seeks an advantage over creditors. Krohn, 886 F.2d at 126. From Krohn, bankruptcy courts in this circuit can glean several non-exclusive factors relevant to an assessment of a debtor's honesty. Such factors that are relevant to this matter include: (1) a consistent pattern of living on credit or beyond one's means; (2) whether the debtor was forced into bankruptcy by unforeseen or catastrophic events; and (3) the debtor's good faith and candor in filing schedules and other documents. See id. at 126–28.[2]

1. In oral argument at the April 27, 2000 hearing, the Blums' attorney was adamant that the record does not reflect any lack of honesty. The Blums take the position that the sole issue before the Court is their need, and particularly, if the Blums are found to be lacking in need, whether that finding by itself is sufficient to justify dismissal under § 707(b). The Court disagrees.

2. Although the first factor was not expressly identified in Krohn, it was expressly identified by the trial court in its analysis that was affirmed and quoted with approval by the

## II

The Blums are professionals who, for at least three years prior to the filing of their Chapter 7 petition on December 14, 1999, maintained a standard of living in excess of considerable income. Mr. Blum is a businessman in executive management. Mrs. Blum is an accountant. Their adjusted gross income for the three years preceding bankruptcy was: (1) $109,766.00 in 1997; (2) $139,000.00 in 1998; and (3) $120,523.00 in 1999. Notwithstanding, the Blums entered the foregoing period with substantial debt and only incurred more with time. Dating back to at least 1997, the Blums have consistently maintained approximately $67,000.00 in credit card debt on nineteen different accounts. Nonetheless, in approximately the Spring of 1998, the Blums obtained credit to purchase a $375,000.00 house in a rural community.[3] Sometime thereafter, the Blums obtained a home equity loan.[4] On April 21 1999, Mr. Blum was extended $12,554.64 in credit to purchase a $13,949.60 tractor.[5] The Blums also chose to enter into a lease for a 1999 Ford Expedition that requires a monthly payment of $450.00.

The Blums claim that around April of 1999, they decided to change their lifestyle. In May of 1999, the Blums listed their house for $425,000.00. In June of 1999, Mr. Blum obtained a $46,120.00 loan against his 401(k) plan. The Blums applied approximately $6,000.00 to $8,000.00 of the loan proceeds to bring their home equity loan current and pay toward some of their credit card debt. They say that they intended to use the $38,000.00 to $40,000.00 balance to close on the sale of their house.[6] The Blums received no offers on their house and reduced the price to $399,000.00. When they still did not receive any offers by August of 1999, they listed the property with a different broker at the same price. By November of 1999, the Blums had spent the balance of the 401(k) proceeds and went to see a bankruptcy attorney. They never received an offer on their house. By the time that the Blums filed their bankruptcy petition, they had entered into a lease for a three bedroom home for $1,000.00 per month.

## III

### 1. CONSISTENT PATTERN OF LIVING BEYOND MEANS

Section 707(b) "serves notice upon those tempted by unprincipled accumulation of consumer debt that they will be held to at least a rudimentary standard of fair play and honorable dealing." *Krohn*, 886 F.2d at 126. The Blums admit, and the record clearly reflects, that they maintained a consistent lifestyle of spending beyond their means. The Blums, however, claim that they turned from this lifestyle and took steps to right the ship in April of 1999. To accomplish this task, the Blums claim that they: (1) attempted to sell their house so that they could move into something more affordable; (2) discontinued the use of all credit cards; and (3) obtained a $46,120.00 loan from Mr. Blum's 401(k) plan to pay for an expected deficiency at the closing of their house. Even if this is true,[7] case law suggests that

---

Sixth Circuit. *See Krohn*, 886 F.2d at 127–28. As will be seen, bankruptcy courts within the Sixth Circuit have relied upon this factor.

3. As of the petition date, the balance on the loan was $334,000.00.

4. As of the petition date, the balance on this loan was $38,960.66.

5. Pursuant to Fed.R.Evid. 201, the Court takes judicial notice of the proof of claim filed by Deere & Company on March 20, 2000,

given that no objection to the same has been filed. *See In re H.E. Graf, Inc.*, 125 B.R. 604, 606 (Bankr.E.D.Cal.1991) (taking judicial notice of claim to which no objection was made).

6. The Blums tendered a net proceeds estimate from a realtor reflecting a net deficit of $18,925.50 assuming a sale price of $375,-000.00.

7. The Court has reason to question the Blum's assertion that they discontinued the

it does not change the result under the honesty test of *Krohn*. *See In re Stallman*, 198 B.R. 491 (Bankr.W.D.Mich.1996); *In re Ragan*, 171 B.R. 592 (Bankr. N.D.Ohio 1994).

In *Stallman*, the debtor "habitually lived beyond his means" until five months prior to the filing of his bankruptcy petition. *Stallman*, 198 B.R. at 499. At that point, however, the debtor: (1) made significant good faith efforts to buy an affordable home; (2) attempted to sell his boat; (3) sought to work out his financial difficulties with some of his creditors; (4) received credit counseling; and (5) discontinued the use of credit cards and stopped incurring new debt. *Id.* at 494, 499. Under the honesty prong of the *Krohn* analysis, however, these factors were not enough to tip the scales in favor of the debtor who "over the years [took] on more debt than he [could] afford as a matter of course." *Id.* at 499.

In *Ragan*, the debtor was separated from his employment as a hospital administrator where he earned $66,000.00 annually. *Ragan*, 171 B.R. at 593. He later obtained a job that paid $6.00 per hour. *Id.* Nonetheless, in the two years following his separation from the hospital, the debtor did not reduce his monthly expenses or credit card debt. *Id.* at 596. Instead, the debtor withdrew $166,000.00 from an individual retirement account, representing his entire retirement savings, and used it to maintain his standard of living while making only minimal payments on credit card accounts. *Id.* at 594, 596. When the re-

tirement funds ran out, the debtor filed a Chapter 7 petition. *Id.* at 596. In light of the honesty standard in *Krohn*, the court concluded that the "[d]ebtor's acts ... of incurring debts which he could not afford to repay but for his retirement income, exhibit bad faith in filing ... and constitute a 'lack of honesty.' " *Id.*

The Blums argue that their voluntary use of Mr. Blum's 401(k) funds to keep the ship afloat between June and November of 1999 demonstrates good faith in dealing with their creditors. However, the funds appear to have been used to maintain the Blum's standard of living beyond their means. No other conclusion can be reached given that these funds were not used to reduce the principal indebtedness on the credit cards or the first and second mortgages.[8] The Blums argue that they couldn't apply the funds toward the principal balance on their credit cards because they needed the money to pay a deficiency at closing. This may be true, but they could have killed two birds with one stone by using the 401(k) funds to reduce or eliminate the $38,960.66 second mortgage. Had they done this, they would have reduced their debt and eliminated the anticipated $18,925.00 deficiency at closing. If the debtor in *Ragan* demonstrated a lack of honesty by using his retirement savings to maintain his standard of living when his income was drastically reduced, then how much more dishonest are debtors who use retirement funds to maintain an imba-

use of all credit cards in April of 1999. Claim number three in the claims registry, to which no objection has been filed, was filed by American Express Travel Related Services Co., Inc. *See supra* note 5. The claim is based upon credit card debt and includes an account history that reflects the use of a card, issued to Mr. Blum, in August, September, October and December of 1999. This, however, is not the only inconsistency that the Court finds with respect to the Blums' representations regarding the use of their credit cards. Mrs. Blum testified that they had "maxed out" their credit cards at least two years prior to their decision to change their spending

habits in April of 1999. If this is so, then how could the Blums discontinue the use of credit cards beginning in April of 1999? If they were "maxed out" for the previous two years, one would think that the Blums would not have been able to use them even if they wanted to.

8. Mrs. Blum testified that $6,000.00 to $8,000.00 of the funds was used to cure an arrearage on the second mortgage and make minimum payments on some credit card debt. The record contains no evidence of the Blums using any of the 401(k) proceeds to reduce the principal on their debts.

lanced standard of living with no reduction of income?

### 2. UNFORESEEN OR CATASTROPHIC EVENTS

Relying upon *Krohn*, courts within the Sixth Circuit also evaluate a debtor's honesty by looking to see whether the bankruptcy was precipitated by an unforeseen or catastrophic event. *See In re Adams*, 206 B.R. 456 (Bankr.M.D.Tenn.1997) (no abuse where bankruptcy was result of: (1) unexpected surgery; (2) support of elderly parents; and (3) loss of overtime hours), *vacated following settlement pending appeal*, 209 B.R. 874 (Bankr.M.D.Tenn.1997) (reaffirming analysis and clarifying that vacation was result of settlement only); *In re Laury–Norvell*, 157 B.R. 14 (Bankr. N.D.Ohio 1993) (no abuse where: (1) debtor was separated and in the midst of divorce proceedings; (2) husband obtained a discharge in bankruptcy; and (3) debtor incurred new obligation to support two adult children and a grandchild); *In re Shepherd*, 147 B.R. 422 (Bankr.N.D.Ohio 1992) (no abuse where: (1) the debtor's live-in companion was charged with rape of a six year old; (2) debtor's brother was murdered; (3) debtor's younger brother was convicted of murder; and (4) a close personal friend of the debtor was killed). In the present matter, there is no record of unforeseen or catastrophic events. The Blums' Chapter 7 filing appears to have been precipitated by nothing more than their excessive spending.

### 3. GOOD FAITH AND CANDOR IN FILING SCHEDULES

The foregoing factors look to prepetition conduct. Any lingering doubts as to the Blums' lack of honesty are relieved when one considers their postpetition conduct. Similar to *Krohn*, several courts have concluded that the filing of amended schedules subsequent to a § 707(b) motion is indicative of substantial abuse. *See e.g., Fonder v. United States*, 974 F.2d 996 (8th Cir.1992); *In re Cohen*, 246 B.R. 658 (Bankr.D.Colo.2000); *In re Weber*, 208 B.R. 575 (Bankr.M.D.Fla.1997); *In re Christie*, 172 B.R. 233 (Bankr.N.D.Ohio 1994).

### A. SCHEDULE J

█ Subsequent to the filing of the motion to dismiss, on the last day to file a response to the motion, the Blums amended Schedule J to reflect an additional $701.00 in expenses that was not originally listed.[9] The increased monthly expenditures are accounted for as follows: (1) an increase in the amount budgeted for electricity and heating fuel from $150.00 to $225.00; (2) an increase in the amount budgeted for water and sewer expenses from $45.00 to $55.00; (3) an increase in the amount budgeted for telephone expenses from $100.00 to $140.00; (4) an increase in the amount budgeted for cable television from $40.00 to $48.00; (5) the addition of an $18 expense for trash collection; (6) an increase in the amount budgeted for food from $700.00 to $800.00; (7) an increase in the amount budgeted for clothing from $100.00 to $200.00; (8) an increase in the amount budgeted for medical and dental expenses from $25.00 to $50.00; (9) the addition of a $150.00 expense for recreation and entertainment; (10) the addition of a $100.00 expense for charitable contributions; and (11) the addition of a $75.00 expense for the use of a cell phone. The Blums argue that both expense schedules were accurate at the time that they were completed and the amendment simply reflects different expenses related to their new housing arrangement. The Court does not find this to be a credible explanation given that the bulk of the increased expenditures are unrelated to the Blums' housing status (e.g., food, clothing, medical and dental expenses, recreation, charitable contributions, and cell phone).

Not only does the court view such expenditures as highly suspect, but these

---

9. Because the amended Schedule J reduced the Blums' "babysitting" expense category by $400.00, the net increase in expenses was $301.00.

amendments are wholly incongruous with the Blums' defense in this matter. In their affidavits and brief, the Blums go to great lengths to persuade the Court that they have made a break with their lifestyle of excessive expenditures and that they have engaged in "good, old-fashioned belt tightening." Yet, in the same breath, the Blums suddenly decide that they need to increase: (1) their food and clothing budgets, each by $100.00 per month; (2) their recreation and entertainment budget by $150.00 per month; and (3) charitable contributions by $100.00 per month. Such conduct belies their theory of the case and demonstrates a lack of honesty.

### B. SCHEDULE I

In addition to Schedule J, the Blums also amended Schedule I subsequent to the motion to dismiss. Prior to the amendment, Mrs. Blum was employed part-time as an accountant and grossed $1,900.00 per month. The amended Schedule I reflects that Mrs. Blum is no longer working. By affidavit, Mrs. Blum represents that she voluntarily terminated her employment so that she could stay home and raise her three children—ages 7, 5 and 3. At least one court has found bad faith where a joint debtor voluntarily terminated her employment on the eve of bankruptcy to reduce income that could have been applied towards a chapter 13 plan. *See In re Helmick*, 117 B.R. 187 (Bankr.W.D.Pa.1990).

A debtor who voluntarily leaves a $10,000.00 a year job on the eve of bankruptcy without showing the necessity

thereof, impresses the Court as a bad faith filer. The Court is cognizant of the fact that Debtors have three (3) children. However, no evidence was produced as to their ages or their care provider. There is no indication that Mrs. Helmick would not return to work if Debtors were granted discharge. Mrs. Helmick's actions must be seen as a calculated move on her part to lower her family's income just prior to filing bankruptcy.

*Id.* at 189–90.

The Blums argue that it was necessary for Mrs. Blum to leave her job to save their family and marriage. The Court is not persuaded. Again, there exists an inconsistency in the Blums' theory of the case. On the one hand, they represent that in April of 1999, they made a break with their former lifestyle for the sake of their family and its continuing viability. However, Mrs. Blum did not leave her job for another eleven months—being the same month, coincidentally, that the motion to dismiss was filed. One would think that Mrs. Blum, if she truly terminated her employment for the sake of her family, would have left her job in April of 1999 when the Blums were supposedly making their radical lifestyle changes for the sake of the family. Similar to the *Helmick* court, this Court has no assurance that Mrs. Blum would not return to work if the Blums were permitted to remain in Chapter 7. Moreover, the instant matter would appear to be more egregious than *Helmick* given that Mrs. Blum did not leave her job until a § 707(b) motion was actually filed.[10]

---

**10.** The Court quickly notes two other aspects of the Blums' schedules that are probative of a lack of honesty. First, although the Blums have supposedly cut the fat from their budget, they nevertheless maintain a monthly expense of $154.00 for tuition. *See Attanasio*, 218 B.R. at 231 ("A number of courts believe that substantial abuse is indicated if a debtor spends money for education of children, other than the usual costs associated with sending minor children to public schools.") (collecting cases). Second, the Blums insist upon maintaining a payroll deduction of $460.54 for the repayment of Mr. Blum's loan from his 401(k)

plan. The Sixth Circuit has held that such a loan repayment constitutes disposable income. *See In re Harshbarger*, 66 F.3d 775 (6th Cir.1995); *In re Fulton*, 211 B.R. 247, 256–57 (Bankr.S.D.Ohio 1997). The Blums argue that this deduction does not constitute disposable income because it is a mandatory payment. A review of the original loan documentation, however, provides that repayment "may" be made by payroll deduction in addition to other acceptable alternatives. Even if repayment were mandatory, however, Mr. Blum's employer would not be entitled to

## IV

For the foregoing reasons, the Court finds that the Blums have substantially abused the provisions of Chapter 7. Accordingly, the Motion to Dismiss Chapter 7 Case Pursuant to 11 U.S.C. § 707(b) (Doc. 17), filed by the United States Trustee on March 9, 2000, will be **GRANTED.** The Blums shall have twenty (20) days from the entry of this order in which to convert this case or the Chapter 7 case will be **DISMISSED.** An order to this effect will be entered.

withhold such amounts if the Blums were in Chapter 13. *See In re Anes,* 195 F.3d 177 (3rd Cir.1999) (payment of loans from retirement plan is not reasonably necessary for maintenance and support even though employer construes payroll deductions to be mandatory).