**In re Fred A. SUMMER, Debtor.**

**No. 99–61712.**

United States Bankruptcy Court, S.D. Ohio, Eastern Division.

Nov. 22, 2000.

Pamela N. Maggied, Columbus, Ohio, for debtor.

William B. Logan, Jr., Luper Sheriff & Neidenthal, Columbus OH, Chapter 7 Trustee.

Alexander G. Barkan, Columbus, Ohio, Assistant United States Trustee.

## MEMORANDUM OPINION AND ORDER

CHARLES M. CALDWELL, Bankruptcy Judge.

This Memorandum Opinion and Order constitutes the Court's findings of fact and conclusions of law regarding the Motion to Dismiss filed by the United States Trustee ("Trustee") and the Opposition to the Motion to Dismiss filed by the Debtor, Fred A. Summer ("Debtor"). This litigation is based upon section 707(b) of the United States Bankruptcy Code ("Code"), that provides for the dismissal of bankruptcy cases where granting chapter 7 relief constitutes a substantial abuse.[1] The Court has considered the testimony, exhibits, stipulations, briefs and statements of counsel, and has determined that the Motion to Dismiss should be granted. To understand the bases for the Court's decision, a brief history of this case follows.

The Debtor is a 54-year-old lawyer currently employed with the prominent law firm of Squire, Sanders and Dempsey ("SS & D"). He is a graduate of prestigious schools: the Columbus Academy, Harvard College, and the University of Michigan School of Law. The Debtor was in the army, and he served in Vietnam. He is married to Sandra Summer ("Mrs. Summer"), and they have three children, Samantha, John and Jeremy. Mrs. Summer is 53 years old and is in good health except for hormone therapy and treatment for anxiety and depression. While Mrs. Summer is professionally trained as a teacher, she has not worked outside the home for more than twenty years. Indeed, her free time is spent in significant charitable endeavors and as a member of an investment club. One of her charitable activities, on behalf of the Columbus Cancer Clinic, requires significant year-round efforts. Mrs. Summer did not join in the filing of this bankruptcy case.

The Debtor's daughter, Samantha, is 24 years old, and now lives in Chicago, earning approximately $40,000.00 per year conducting market research. John is 18 years old, and has recently graduated from the Columbus Academy. Jeremy is 17 years old, and is currently a senior at the Columbus Academy. All of the children are in good health.

Upon completing law school, the Debtor joined the law firm of Dunbar, Kienzle & Murphey, that later became known as Murphey, Young & Smith. That firm merged with SS & D in 1988. At the time of the merger, the Debtor was earning an annual gross salary of approximately $156,000.00. This salary fluctuated between $140,000.00 and $160,000.00 until the mid–1990s, when it dropped dramatically to $130,000.00 after the Debtor was asked to withdraw as a partner and become of counsel.

Currently the Debtor earns a gross annual salary in the amount of $210,000.00, and this year he was awarded a bonus in the amount of $20,000.00. In 1999, the Debtor was awarded a bonus in the amount of $15,000.00. To achieve his current level of compensation, the Debtor testified he billed approximately 2,500 hours last year. The Debtor's testimony indicates that his employment with SS & D is stable. The Debtor also works as an adjunct professor at the Capital University School of Law, earning a modest gross amount of approximately $2,000.00 annual-

---

1. Section 707(b) provides in relevant part as follows:

 After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, ... may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor....

ly. During his professional career, the Debtor has had some significant health problems, including three back operations and open heart surgery. While he did miss some work, there was no loss of income during those periods. At this point, the Debtor appears to be in reasonably good health.

Since graduation from law school, the Debtor has been engaged in a commendable effort to provide a very comfortable lifestyle for his family. This lifestyle has included: (a) a $300,000 home in the city of Bexley, Ohio; (b) private school tuition at the Columbus School for Girls and the Columbus Academy for three children; (c) college tuition for his daughter at the University of Michigan, and now possibly his eldest son at the University of Wisconsin; (d) a country club membership; and (e) annual trips to Florida, substantially funded by the Debtor's parents. While this lifestyle may appear extravagant, the Court observes that it appears consistent with the Debtor and Mrs. Summer's background, and it is consistent with the impressive academic credentials and professional accomplishments of the Debtor. The problem is, however, that over time the Debtor was unable to sustain his commendable efforts on his income, alone. Over the years, he increasingly relied on consumer credit to sustain this lifestyle, rather than making timely adjustments to reasonably sustainable levels.

The fabric of this lifestyle slowly but steadily unraveled when the Debtor became of counsel and suffered a $30,000.00 per year pay cut. This drastic reduction led to the opening and use of more credit card accounts, consumer loans, a second mortgage, and finally, loans against his pension plan. This difficulty was exacerbated with a change in the pension plan's policy that limited the frequency of loans. All of these circumstances prompted the sale of the Debtor's home and relocation to an apartment, and the cancellation of the country club membership. The modest net proceeds from the sale of the home ($7,000.00) was applied to bills and tuition, but did little, if anything, to halt the financial decline. Also during this period, the Debtor deferred the routine replacement of vehicles, and he and his family retained two vehicles dating back to the mid–1980s. Finally, the Debtor tried consumer credit counseling but was informed that his cash flow was insufficient to fund a repayment plan at an acceptable level.

After having gone through all of this, the Debtor, finally overburdened with collection efforts and on the brink of financial collapse, consulted experienced bankruptcy counsel. This belated contact resulted in the instant chapter 7 filing, commenced on December 28, 1999. Like many debtors before this Court, the delay in seeking such guidance only served to make matters worse, and to make any possible reorganization efforts more difficult.[2]

The Statement of Affairs and Schedules filed on behalf of the Debtor describe in great detail the current financial condition of this family. The Statement of Affairs shows gross income for 1997 in the amount of $156,750.00, for 1998 in the amount of $172,900.00, and year-to-date income for 1999 in the amount of $174,400.00. On Schedule B—Personal Property, the Debtor disclosed property in the total amount of $207,925.00, primarily composed of a pension plan valued at approximately $200,000.00. It also included four life insurance policies, three of which were subject to outstanding loans. The Debtor also disclosed two vehicles, a 1986 Oldsmobile and a 1987 Oldsmobile valued in the amounts of $500.00 and $600.00, respectively.

On Schedule D—Creditors Holding Secured Claims, the Debtor disclosed obli-

---

**2.** *See generally,* Constance M. Kilmark, *Inside the World of the Troubled Debtor,* (2000) (Material presented at the 2000 National Conference of Bankruptcy Judges, that explores the emotional and psychological dimension of financial problems and describes the impact of financial problems upon debtors and their families).

gations for electronic equipment and furniture in the total amount of $4,666.00. On Schedule F—Creditors Holding Unsecured Nonpriority Claims, the Debtor disclosed debt in the aggregate amount of $240,049.06. Approximately 15 credit card accounts are listed, some of which were used as recently as July 1999, five months prior to this filing. Some of the creditors listed have opened multiple accounts with the Debtor. The Debtor testified that he obtained cash advances on the credit cards to make payments on his credit obligations. Two of the obligations scheduled are to Beneficial Finance and Household Finance Company in the respective amounts of $11,460.82 and $4,920.00, and were incurred in late 1998 and early 1999. The Debtor also scheduled three educational loans that pertain to his children in the amount of approximately $50,000.00.

Schedule I—Current Income of Individual Debtor(s) and Schedule J—Current Expenditures of Individual Debtor(s), provide significant detail of the monthly income and expenditures of the Debtor and his family.[3] When the monthly income and expense are compared, using the Debtor's numbers detailed below, there is a modest monthly net in the amount of

$181.80. The United States Trustee asserts, however, that many of the items could be reduced and/or eliminated to fund a chapter 13 plan. The Debtor has sought to justify the expenditures through his own testimony, and has provided unchallenged expert testimony through which it is asserted that there is a very limited possibility of a meaningful return to creditors in a hypothetical chapter 13 plan. The Court will discuss the most significant budget items at issue.

### Pension Plan Contributions/ Pension Plan Loan Repayment

On a monthly basis, the Debtor has the sum of $666.66 deducted from his gross pay for the pension plan with SS & D. Also on a monthly basis, the sum of $1,374.02 is deducted from his gross wages to repay outstanding loans from the pension plan. If this case had been commenced under chapter 13, these expenditures would be subject to challenge by the Standing Chapter 13 Trustee and may be added into disposable income for purposes of funding plan payments. *In re Harshbarger,* 66 F.3d 775, 777–778 (6th Cir.1995); *In re Esquivel,* 239 B.R. 146, 153–155 (Bankr. E.D.Mich.1999).

3. The relevant items include:

| | |
|---|---|
| Current monthly gross wages, salary & commissions: | $15,833.34 |
| Less Firm (Pension) Plan Contribution: | $666.66 |
| **Subtotal:** | $15,166.68 |
| Less Payroll Deductions: | |
| a. Payroll taxes and social security: | $4,351.10 |
| b. Insurance: | $889.76 |
| c. Other: pension loan repayment: | $1,374.02 |
| **Subtotal of Payroll Deductions:** | $6,614.88 |
| **TOTAL NET MONTHLY TAKE HOME PAY:** | **$8,551.80** |

On the expenditure side the relevant items include:

| | |
|---|---|
| Rental payment: | $1,325.00 |
| Utilities: | |
| Electricity and heating fuel: | $250.00 |
| Water and sewer: | $40.00 |
| Telephone, including cell phones | $160.00 |
| Other: cleaning: | $320.00 |
| Home Maintenance: | $50.00 |
| Food and household products: | $650.00 |
| Clothing: | $250.00 |
| Laundry and dry cleaning: | $75.00 |
| Medical and Dental expenses: | $250.00 |
| Transportation (not including car payments): | $300.00 |
| Recreation, clubs, and entertainment, newspapers, magazines, etc.: | $150.00 |
| Insurance (not deducted from wages): | |
| Homeowners or renters & vehicle (projected based on vehicle replacement) | $400.00 |
| Life Insurance: | $350.00 |
| Other: Computer loan $150; furniture purchases $250 | $400.00 |
| Installment payments: | |
| Auto projected cost 2 vehicles replacement: | $800.00 |
| Other: student loans $410; sons' tuition $1855, Books $75, professional dues $60: | $2,400.00 |
| Ongoing payment of wife's obligations: | $200.00 |
| **TOTAL MONTHLY EXPENSE:** | **$8,370.00** |

According to the parties' stipulations, as of June 15, 2000, the sum of $33,000.00 is owed on the pension plan loans, and that if loan payments stop, a taxable distribution will be deemed to have occurred, requiring the treatment of the outstanding balances, including interest, as income on the Debtor's year 2000 tax returns. On top of this, there would be a 10 percent excise tax on premature distributions because the Debtor is under age 59½. The parties have stipulated that the resultant federal, state and local tax liability would be in the approximate amount of $19,008.00.

The expert testimony presented by the Debtor indicates that the Debtor has additional tax problems. Specifically, upon the sale of the home, the Debtor failed to adjust his withholding, and now owes the sum of approximately $7,000.00 to the Internal Revenue Service. Also, the $20,000.00 bonus received this year will increase his taxable income. In view of these tax problems and those associated with the pension plan, the expert testimony offered on behalf of the Debtor indicates a possible chapter 13 dividend of between four and ten percent. This dividend range may be higher (ten to twelve percent), according to the expert testimony, depending upon whether the pension plan loan payments went unchallenged by the Standing Chapter 13 Trustee under sections 1325(b)(1)(B) and (2)(A) of the Code.

### Life Insurance

The Debtor has deducted from his gross wages the sum of $889.76 for insurance. According to his testimony, this figure includes health, disability and life insurance. The life insurance policy provides coverage in the amount of $750.000.00 payable to Mrs. Summers. The Debtor testified that this policy was acquired as mandatory coverage when he was a partner with SS & D. In addition to this policy, the Debtor also pays on a monthly basis from his net income the sum of $350.00 for three other smaller life insurance policies, the largest of which costs $306.00 per month and provides a benefit of $250,000.00 payable to Mrs. Summers. The other two policies have a death benefit of $10,000.00 each. The Debtor testified that because of his chronic health condition, aortic insufficiency, it may be difficult to obtain other life insurance coverage if the existing policies were canceled.

### Telephones, Maid Service and Recreation

The Debtor spends the sum of $160.00 per month for telephone service and the sum of $320.00 per month for maid service. Regarding the telephones, approximately $60.00 per month pays for two cellular phones. The Debtor and his family also spend approximately $150.00 per month for recreation. The expert witness presented by the Debtor testified that she would recommend that the cellular phones be eliminated. Regarding the maid service, the Debtor testified that Mrs. Summer is especially concerned with maintaining a clean home, and that it is the one thing from their former lifestyle she has a strong desire to hold on to. The maid cleans twice per week. The expert witness offered by the Debtor indicated that she would recommend that this item be reduced by at least fifty percent. The expert witness also testified that she would recommend that the Debtor and his family reduce the recreation budget item by $100.00 per month.

### Projected Vehicle Replacement

The Debtor listed the sum of $800.00 per month for the acquisition of two replacement automobiles in the future. As previously discussed, the Debtor and his family were driving two older vehicles disclosed in the Schedules that would inevitably have significant mechanical difficulties over time. The Debtor testified that at least one of the vehicles will have to be replaced because it developed timing chain problems and was sold for $45.00, since the repairs would have cost approximately $600.00. The remaining vehicle detailed in the Schedules has nearly 180,000 miles; however, Mrs. Summer's mother gave her

a vehicle (1985 Oldsmobile Ciera) to drive that has approximately 70,000 miles. This vehicle is also used by the Debtor's sons. The Debtor testified that to replace the one vehicle that was sold would cost between $300.00 and $400.00 per month. The Debtor also testified that to reduce expenses, he has made significant use of public transportation.

### Tuition and Student Loans

The Debtor is currently paying the sum of $410.00 per month towards educational loans for his daughter, who is now 24 years old and fully employed with a job earning approximately $40,000.00 per year. The loans were incurred by the Debtor. The Debtor also testified that the tuition for his two sons at the Columbus Academy was $1,855.00 per month. Only the youngest son remains there, however, and he will graduate this year. The Debtor expressed a strong desire to pay for the education of his children, and testified that removing the one child from private school during his last year would be very damaging. The Debtor also testified that de did not believe his daughter had the financial ability to repay the student loans. The Debtor's expert witness did not suggest any reduction of these expense items, and indeed, recommended that to make any chapter 13 plan viable, the student loans payments should continue to be paid outside the plan.

Based upon the evidence and a review of the budget items, the Court finds that the Debtor and his family have not yet completely adjusted their lifestyle to reasonably sustainable levels. For example, the $320.00 per month for maid service twice a week could be eliminated entirely. Mrs. Summer does not work outside the home, and even given her charitable commitments, with the assistance of the Debtor and the one remaining child, they could maintain their home. Regarding the monthly recreation item ($150.00) and the telephone item ($160.00), as the expert testimony suggested, they could be signifi-

cantly reduced without any harm to the Debtor and his family.

Regarding the educational expenditures, the Court respects the Debtor's motivation, but finds that it is simply unrealistic. The daughter is 24 years old, and she is working. In view of her salary (approximately $40,000 per year), she should be able to pay all or part of the monthly payments ($410.00) for her own college education. With reference to the private school tuition for the son at home, the Court does not think that the expenditure is unreasonable given the fact that only one school year remains, and that removing the child at this point would be disruptive. Upon graduation, the funds could be channeled back toward increasing the level of monthly plan payments in any chapter 13 plan.

Regarding the projected expenditure for automobiles ($800.00), the Court finds that only one car should be replaced in view of the fact that one vehicle disclosed in the Schedules has been sold, and the other scheduled vehicle has high mileage. One additional vehicle, along with the car given to Mrs. Summer, should be sufficient. Also, the Debtor should be able to find reliable transportation for substantially less than $800.00 per month, and he and his family may have to make additional use of public transportation in the event any of the remaining vehicles become too expensive to maintain. While such an accommodation is not necessarily comfortable, it is an adjustment that is realistic given the Debtor's financial condition.

Finally, the budget includes the sum of $200.00 per month for payment of Mrs. Summer's credit obligations, the sum of $400.00 per month related to electronic equipment and furniture, and the sum of approximately $1,000 per month for life insurance. The Court observes that these items could be made part of any plan payment in the event of a joint chapter 13 filing or substantially reduced as far as the life insurance is concerned. In view of the large amount of life insurance coverage,

one or more of the smaller policies could be eliminated without harming the Debtor's family. Also, in view of the fact that all of the children either are or will soon be on their own, Mrs. Summer could take steps to reenter the job market, and seek paid employment outside the home. Like other budget items discussed, this is an adjustment that is long overdue, given the current financial condition of the Debtor and his family.

 Fortunately, in this Jurisdiction there is controlling legal authority that clearly and concisely expresses the purpose of chapter 7 bankruptcy relief and the role of the Court where that relief is challenged as a substantial abuse. As stated by the Court in *In re Krohn*, 886 F.2d 123, 125–126 (6th Cir.1989):

> One of the primary purposes of bankruptcy is to relieve an honest debtor from the weight of oppressive indebtedness and permit him to start afresh.... A fresh start is afforded through discharge of all or a portion of his debts.... Section 707(b) was among the consumer credit amendments to the Bankruptcy Code of 1984.... *These amendments were passed in response to an increasing number of chapter 7 bankruptcies filed each year by non-needy debtors....* Under prior practice, aside from potential § 523(a) exceptions, § 707(a) dismissals, and § 727(a) objections to discharge, debtors enjoyed an unfettered right to a "fresh start" under chapter 7 in exchange for liquidating their nonexempt assets for the benefit of their creditors. *In re Krohn* at 125–126 (citations omitted) (emphasis supplied)

The purpose of substantial abuse dismissal under section 707(b) has been defined as follows:

> [It] allows a bankruptcy court to deal equitably with the unusual situation where an unscrupulous debtor seeks to enlist the court's assistance in a scheme to take unfair advantage of his creditors; *it serves notice upon those tempted by unprincipled accumulations of consumer debt that they will be held to at least a rudimentary standard of fair play and honorable dealing. In re Krohn* at 126. (emphasis supplied)

The judicial implementation of section 707(b) has been extremely difficult, and varied. One of the primary criticisms has been the discretion afforded bankruptcy judges in deciding which cases should be dismissed, and this criticism has fueled arguments for the institution of means testing currently under consideration in Congress.[4]

 Upon determining that the debts at issue are primarily consumer in nature, courts are required to examine the totality of the circumstances and determine the answers to two alternative questions: (a) whether a debtor is honest; and (b) whether a debtor is needy. *Id.* Honesty, in the substantial abuse context, means that a debtor is not seeking an unfair advantage over creditors, but has dealt with them honorably and without any deception. *Id.* Honesty is ascertained by examining, among other factors: (a) whether the debtor acted in good faith and candor in disclosing all assets and liabilities in all of the bankruptcy filings; (b) whether the debtor

4. *See* Williams, *Distrust: The Rhetoric and Reality of Means–Testing,* 7 Am.Bankr.Inst. L.Rev. 105 [1999] (author discusses section 707(b) as a form of means testing, discusses proposals recently considered by Congress and suggests a new model that provides some judicial discretion but with increased statutory guidance); Anthony, *"Substantial Abuse" Under Section 707(B) of the Bankruptcy Code: American Consumers Learn Declaring Bankruptcy May Cease to Be a Way Out,* 67 U.Cin.L.Rev. 535 [1999] (author discusses the varied implementation of section 707(b) in Ohio bankruptcy courts and discusses proposed legislative adjustments to the current law). Another commentator questions whether we have overreacted to instances of abuse and erected unnecessary barriers to chapter 7 relief that raise serious moral and political questions. *See,* Coulson, *Substantial Abuse of Bankruptcy Code Section 707(B): An Evolving Philosophy of Debtor Need,* 52 Consumer Fin. L.Q., Rep. 261 [1998].

has engaged in any "eve of bankruptcy purchases"; and (c) whether the debtor was forced into chapter 7 by unforeseen or catastrophic events. *Id.*

■ In determining need, the Court may examine, among other factors: (a) a debtor's ability to pay his obligations from future earnings; (b) whether the debtor has a stable source of future income; (c) whether the debtor is eligible for chapter 13 relief; (d) the availability of other remedies through state courts or private negotiations; and (e) whether budget items can be reduced without deprivation of basic life necessities. *Id.* at 126–127. The movant, by a preponderance of the evidence, has the burden of proof on all elements. *In re Browne,* 253 B.R. 854, 856–857 (Bankr. N.D.Ohio 2000).

Based upon a review of substantial abuse case law in Ohio bankruptcy courts subsequent to *In re Krohn,* it appears that cases are generally dismissed where there is a consistent pattern of living beyond one's means at the expense of creditors. *In re Blum,* 255 B.R. 9 (Bankr.S.D.Ohio 2000) (debtor used 401k loan to continue high lifestyle); *In re Braithwaite,* 192 B.R. 882, 884 (Bankr.N.D.Ohio 1996) (debtor charged the sum of $1,795.25 for travel within 90 days prior to filing); *In re Ragan,* 171 B.R. 592, 595–596 (Bankr. N.D.Ohio 1994) (reckless expenditure of $160,000.00 retirement account after loss of employment). Other factors that have prompted dismissal include: (a) significant cushion or monthly net income in budgets (*In re McCormack,* 159 B.R. 491, 495 (Bankr.N.D.Ohio 1993) and *In re Smith,* 157 B.R. 348, 351 (Bankr.N.D.Ohio 1993)); (b) lack of candid disclosure in schedules (*In re Sanseverino,* 171 B.R. 46, 48–49 (Bankr.N.D.Ohio 1994)); and (c) maintenance of luxury items (boat) (*In re Wilkinson,* 168 B.R. 626, 629–630 (Bankr. N.D.Ohio 1994)).

On the other hand, Ohio bankruptcy courts have not dismissed cases for substantial abuse that can best be described as instances where debtors were able to meet their substantial credit obligations until some medical problem, calamity or other significant change occurred that tipped them over the edge. *In re Messenger,* 178 B.R. 145, 148–150 (Bankr. N.D.Ohio 1995) (disabled child); *In re Martens,* 171 B.R. 43, 46 (Bankr.N.D.Ohio 1994) (long-standing medical bills); *In re Martinez,* 171 B.R. 264, 267 (Bankr. N.D.Ohio 1994) (vast majority of debt related to medical services); *In re Fessler,* 168 B.R. 622, 625 (Bankr.N.D.Ohio 1994) (significant period of unemployment); *In re Beles,* 135 B.R. 286, 288 (Bankr. S.D.Ohio 1991) (debtor became temporarily unemployed, suffered a heart attack, and had to help support a daughter); *In re Browne,* at 855 (newly married debtor brought significant debt to marriage, had a modest lifestyle and worked two jobs).

■ In the instant case, there is no hint of dishonesty or lack of full disclosure. Indeed, the Debtor has been very candid and cooperative with the United States Trustee in supplying financial information for this litigation. The Court, however, has concluded that this case should be dismissed as a substantial abuse for the following reasons.

First and foremost, the Debtor and his family have for a number of years imposed upon creditors to fund a very comfortable lifestyle that could not be sustained on their income, alone. This pattern has not changed even when faced with significant clues, such as a reduction in pay. They did not act promptly to reduce their expenses, but have relied on credit to continue paying for maid service, private school tuition, college education, cellular telephones, etc. This failure to deal with reality has been the cornerstone of their financial decline, and in this case the Court concludes that it is fundamentally unfair for creditors to bear this burden, alone.

Second, the Debtor has steady employment with a prestigious law firm and earns a salary that is handsome by any standard. While he has explored consumer credit

**564**

counseling, it is not clear that he has fully considered the viability of a chapter 13 proceeding or, perhaps in view of the pension plan problems, the viability of a chapter 11 reorganization proceeding. There are several adjustments to the budget detailed in this opinion that could be made without any deprivation of the basic needs of the Debtor and his family. Further, the Debtor has not explored the possibility of increasing the family income by having Mrs. Summer seek employment outside of the home. Instead, the Debtor and his family appear to be engaged in an effort to maintain their past lifestyle, again at the expense of creditors, by seeking to discharge consumer credit obligations far in excess of $100,000.00. What this case needs is some significant belt-tightening, exploration of available repayment remedies, and increased income through additional outside employment, rather than the maintenance of the status quo, at the expense of creditors.

For these reasons, the Court concludes the Debtor, while honest, has not dealt fairly with his creditors and has failed to convince the Court that he and his family are unable to repay, at least in some small part, their considerable financial obligations. Accordingly, this case shall be **DISMISSED** within thirty days in the event the Debtor does not seek conversion to chapter 13 or 11 of the United States Bankruptcy Code.

**IT IS SO ORDERED.**