**In re Wendy Ann WELCH, Debtor.**

**No. HM 05–90206.**

United States Bankruptcy Court,
W.D. Michigan.

Aug. 4, 2006.

---

Kalen E. Lipe, Esq., Iron Mountain, MI, for the Debtor.

Michael V. Maggio, Esq., Grand Rapids, MI, for the United States Trustee.

### *OPINION RE: UNITED STATES TRUSTEE'S MOTION TO DISMISS PURSUANT TO 11 U.S.C. SECTION 707(b)*

JEFFREY R. HUGHES, Bankruptcy Judge.

The United States Trustee ("UST") filed a motion to dismiss Wendy Ann Welch's Chapter 7 proceeding under Section 707(b) of the Bankruptcy Code.[1] The motion is denied.

---

1. 11 U.S.C. § 707(b). All further references    to "Section ___" in this opinion are also to

## FACTUAL BACKGROUND

Ms. Welch lives in Quinnesec, which is a small community in Michigan's upper peninsula. Ms. Welch is married and has a 13 year old son. She is employed in nearby Iron Mountain. Iron Mountain itself has a population of only 8,000.

Ms. Welch's Schedule I indicates that she had a monthly net income of $1,523.33 when she filed her petition for relief in March 2005.[2] However, that amount reflects non-tax deductions of $434.06 for health insurance and $160.00 for her car payment to the credit union. Therefore, Ms. Welch's monthly after-tax income was in fact $2,117.39 when she filed her bankruptcy petition. Her after-tax income has since increased to $2,251.06 per month.

It appears that Ms. Welch will earn at least as much as she is currently earning for the foreseeable future. She is in relatively good health[3] and well short of retirement. Ms. Welch did express some concern that her job might be eliminated through an office consolidation. However, she did not offer anything to substantiate her concern.

Troy Welch, Ms. Welch's husband, did not file for bankruptcy relief. Ms. Welch nonetheless disclosed on her Schedule I that her husband's monthly after-tax income was $2,080.00 at the time of her petition. She also testified that his after-tax income has since increased to $2,853.00 per month.

Ms. Welch listed her own monthly expenses at $683.00 on one Schedule J and her husband's monthly expenses at $1,997.00 on a separate Schedule J. However, Ms. Welch testified at trial that she grossly understated her and her husband's expenses when she had prepared those schedules. She presented in conjunction with her testimony an exhibit that set out what both her and her husband actually averaged as expenditures from October 2004 to January 2005. That exhibit indicated that Ms. Welch's expenditures averaged $1,854.00 per month instead of the $683.00 per month she had previously disclosed in her Schedule J. The exhibit further indicated that Mr. Welch's actual monthly expenditures averaged $2,855.00 per month instead of the $1,997.00 per month Ms. Welch had disclosed in his original Schedule J.

Ms. Welch also introduced other exhibits that suggested that her husband's and her actual monthly expenditures were even higher than these averages. One exhibit indicated that the combined four-month average was still understated by $331.00 per month. Another exhibit then recalculated Mr. and Ms. Welch's average expenditures over a longer 12-month period. This recalculation resulted in Ms. Welch's average expenditures increasing to $2,516.00 per month and her husband's average expenditures increasing to $3,044.00 per month.

The UST called Colleen Olson and Mary Viegelahn Hamlin as experts.[4] Ms. Olson testified that Ms. Welch could contribute $800.00 per month to fund a Chapter 13 plan if only her own income and expenses

---

the Bankruptcy Code, 11 U.S.C. §§ 101 et seq.

**2.** Ms. Welch slightly understated both her own and her husband's net income by using 4 weeks instead of 4.3 weeks to convert their weekly take home pay to monthly amounts.

**3.** Ms. Welch does have a chronic sinus condition. However, it does not appear to impede her ability to work.

**4.** Ms. Olson is the panel trustee appointed to administer Ms. Welch's bankruptcy estate. Ms. Hamlin is a Chapter 13 trustee for this district. However, her territory does not include Michigan's upper peninsula.

were considered and that she could contribute $1,523.00 per month to fund a Chapter 13 plan if her husband's income was also considered. However, Ms. Olson's calculation was based upon Ms. Welch's original Schedules I and J. Therefore, Ms. Olson did not consider either the post-petition increase in Ms. Welch's or her husband's net income or the substantial adjustments Ms. Welch claimed are necessary to accurately reflect her and her husband's actual monthly expenditures.

Ms. Hamlin also opined that Ms. Welch had sufficient disposable income to fund a Chapter 13 plan. However, Ms. Hamlin, unlike Ms. Olson, did take into account the adjustments Ms. Welch had offered with respect to her original Schedules I and J. Ms. Hamlin nonetheless concluded that Ms. Welch still had $510.00 per month to fund a Chapter 13 plan. Ms. Hamlin also testified that the Welchs' expenditures were excessive and that, therefore, Ms. Welch could contribute even more to fund a Chapter 13 plan by doing some simple economizing. For example, Ms. Hamlin testified that the Welchs' home mortgage payments exceeded the IRS housing allowance [5] for Dickinson County by at least $200.00, that their monthly food expense of $748.00 could be reduced to about $500.00 and that their monthly cable/internet bill of $112.00 could be reduced to $60.00.

### DISCUSSION

■ Pre–BAPCPA 707(b) [6] requires that an individual debtor's Chapter 7 proceeding be dismissed: (a) if the debtor's debts are primarily consumer debts; and (b) if granting the debtor relief under Chapter 7 would result in a substantial abuse of that chapter. Ms. Welch acknowledges that most, if not all, of her debts are consumer debts. Therefore, the only disputed issue is whether granting relief to her under Chapter 7 would constitute a substantial abuse.

■ The UST contends that Ms. Welch substantially abused the provisions of Chapter 7 because she does not "need" the protections it offers. See, *In re Krohn,* 886 F.2d 123, 126–27 (6th Cir.1989). Whether a debtor needs Chapter 7 relief generally requires consideration of all of the debtor's circumstances. *Id. In re Mars,* 340 B.R. 844 (Bankr.W.D.Mich. 2006). However, in some instances, a debtor's disposable income may be so large that that factor alone is sufficient to support a finding of substantial abuse. *See, e.g., In re Wilson,* 125 B.R. 742 (W.D.Mich. 1990), *In re Stallman,* 198 B.R. 491 (Bankr.W.D.Mich.1996). *See, also, In re Behlke,* 358 F.3d 429, 435 (6th Cir.2004) (court observing that "one way courts determine debtor's ability to pay is to evaluate whether there would be sufficient dis-

---

**5.** The Internal Revenue Service has established household budgeting standards to be used in conjunction with the enforcement of the Internal Revenue Code. These standards have also become relevant with respect to bankruptcy proceedings as the result of Congress' enactment of the Bankruptcy Abuse Protection and Consumer Protection Act of 2005. Pub.L. 109–8 § 102. For example, the IRS standards are now used in connection with determining whether a Chapter 7 debtor has abused the provisions of that chapter. 11 U.S.C. § 707(b)(2).

**6.** Congress substantially amended Section 707(b) when it enacted the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA"). Among other things, Congress reduced the requisite conduct from "substantial abuse" to only "abuse" and it established a presumption of abuse based upon what has frequently become known as a "means" test. However, Ms. Welch filed her petition before the effective date of the amendment. Therefore, whether Ms. Welch's Chapter 7 proceeding should be dismissed or not remains subject to the former "substantial abuse" standard.

posable income to fund a Chapter 13 plan.").

Ms. Welch has not established any circumstance that would warrant special consideration under Section 707(b). There is also ample room in the combined budgets of Ms. Welch and her husband to exercise, as *Krohn* put it, some "good, old-fashioned belt tightening." *Krohn*, 886 F.2d at 128. Ms. Welch's most recent calculation of what it costs to maintain her family of three is $5,560.00 per month. However, this amount is a $2,880.00 increase from the $2,680.00 per month she stated as her and her husband's combined expenses in the original Schedule Js she filed in March 2005, and a $1,694.00 increase from the $3,866.00 she stated as her and her husband's combined expenses in the amended Schedule Js she filed in June of 2005.

Ms. Welch has explained her escalating expenses as actually nothing more than a correction. She testified that it has taken her some time to finally realize that her family's expenses are greater than what she and her husband bring home in earnings and that she has been funding the difference with her credit cards. However, the fact that Ms. Welch can now account for her expenditures does not mean that they are justified. I have no question that Ms. Welch and her family are capable of expending more than every dollar that is earned each month. Indeed, it appears that the reason Ms. Welch is before this court is that she and her family have demonstrated this ability for some time.

What Ms. Welch has not established is why her family of three requires $5,560.00 a month to maintain their household. By way of comparison, Ms. Hamlin, the UST's expert, opined that a reasonable budget for a family of three in the Iron Mountain area would be $2,800.00 to $3,000.00 per month.

Granted, Ms. Welch and her family have experienced unexpected expenses. Ms. Welch herself continues to be bothered by a sinus condition and her son has been in the emergency room twice within the last year for unexpected injuries. However, the difference between what Ms. Welch and her family actually spend and what they need to spend appears to be for the most part simply a reflection of the lifestyle they have chosen. Ms. Welch and her family average nearly $1,000.00 per month on groceries, dining out, and school lunches,[7] $120.00 per month for cable and internet and $80.00 per month for gifts. Mr. Welch also paid $845.00 (or approximately $70.00 per month) for a golf club membership in 2004.

In addition, Ms. Welch averaged $1,326.00 per month in mortgage payments on a house which she herself described as "not luxurious" and as needing repairs. It is therefore fair to ask why she and her family are paying so much for housing. Ms. Hamlin testified that the IRS allowance for housing and utilities for the county in which the Welchs live is only $878.00 per month. "Old fashioned belt tightening," if not common sense, suggests that they move. Indeed, a move might also reduce some of the extra costs Ms. Welch claims her family has had to incur because they live in the country.

However, the question before me is not whether the Welch family is substantially abusing the provisions of Chapter 7 but whether Ms. Welch herself is substantially abusing those provisions. Had Ms. Welch been single, it is unlikely that the UST would have filed a Section 707(b)

---

7. The 2004 accounting actually included food-related line items that averaged $1,297.00 per month. However, one line item also included personal products and another line item included cleaning products and home maintenance.

motion to dismiss her case. A single person should certainly be able to live comfortably in the upper peninsula on the $2,251.06 per month Ms. Welch currently earns after taxes. On the other hand, to characterize a single person who is living on an annualized budget of just over $27,000.00 as a "substantial abuser" of the Chapter 7 system would seem unfair. After all, former Section 707(b) was designed to ensnare only the "unprincipled" and "unscrupulous" debtor. *Krohn*, 886 F.2d at 126.

Ms. Welch, though, is not single. She is married and her husband is employed. Consequently, the Welchs' household income is more than twice as much as what Ms. Welch earns herself. Should Ms. Welch's marital status make a difference in the Section 707(b) analysis? In other words, is Ms. Welch a substantial abuser of the system because her husband also earns a living?

The courts have consistently held that a non-filing spouse's income should be considered in connection with a Section 707(b) motion against a debtor. *See, e.g., United States Trustee v. Duncan (In re Duncan)*, 201 B.R. 889 (Bankr.W.D.Pa.1996); *In re Rysso*, 321 B.R. 522 (Bankr.D.Minn.2005); *In re Falke*, 284 B.R. 133 (Bankr.D.Or. 2002); *In re Staub*, 256 B.R. 567 (Bankr. M.D.Pa.2000); *In re Strong*, 84 B.R. 541 (Bankr.N.D.Ind.1988); *In re Smith*, 157 B.R. 348 (Bankr.N.D.Ohio 1993); *In re*

*Berndt*, 127 B.R. 222 (Bankr.D.N.D.1991); *In re Wilkinson*, 168 B.R. 626 (Bankr. N.D.Ohio 1994). However, the courts do not agree as to exactly how the non-filing spouse's income is to be considered.

The courts have all approached this issue from the perspective of whether the debtor "needs" the Chapter 7 proceeding in light of his or her ability to fund a Chapter 13 plan. Consequently, the analysis inevitably leads to how a non-filing spouse's income should be considered for purposes of determining the debtor's disposable income under Section 1325(b).[8]

> The importance accorded the income and expenses of a non-petitioning spouse in substantial abuse cases should be similar to the significance given this same factor in considering Chapter 13 plan confirmations and the undue hardship discharge of student loans. In Chapter 13 cases where a married debtor files a single petition, courts commonly consider the debtor's income from all sources, including a non-debtor spouse, when assessing compliance with the plan confirmation requirements. 11 U.S.C. § 1325. *In re Sellers*, 33 B.R. 854, 857 (Bankr. D.Col.1983). Indeed, an accurate analysis of Chapter 13's disposable income test (11 U.S.C. § 1325(b)) is impossible unless the income of a non-debtor spouse is included in the budget. *Mat-*

---

**8.** Section 1325(b)(1) requires a debtor's Chapter 13 plan to commit all of the debtor's disposable income to funding the plan for a minimum period of time. 11 U.S.C. § 1325(b)(1). Pre–BAPCPA Section 1325(b)(2) then defined "disposable income" as:

> ... income which is received by the debtor and which is not reasonably necessary to be expended—
> (A) for the maintenance or support of the debtor or a dependent of the debtor, including charitable contributions (that meet the

definition of "charitable contribution" under section 548(d)(3)) to a qualified religious or charitable entity or organization (as that term is defined in section 548(d)(4)) in an amount not to exceed 15 percent of the gross income of the debtor for the year in which the contributions are made; and
> (B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

11 U.S.C. § 1325(b)(2) (2004)(amended 2005).

*ter of Saunders,* 60 B.R. 187 (Bankr. N.D.Ohio 1986).

\* \* \* \* \* \*

In this court's estimation, the circumstances surrounding a substantial abuse inquiry are analogous to those present in Chapter 13 plan confirmation and undue hardship situations. All three necessitate a determination of how much disposable income, after subtracting reasonable and necessary expenses, will be available to a given debtor. There is no justification for ignoring the impact of a non-petitioning spouse's income on a debtor's financial situation. *In re Kern,* 40 B.R. 26 (Bankr.S.D.N.Y.1984).

*In re Strong,* 84 B.R. at 543. *See, also, In re Smith,* 157 B.R. at 350.

Courts recognize that there is no authority under Section 1325(b) itself to simply add the non-filing spouse's income to the debtor's own income for purposes of calculating the debtor's disposable income. *In re Belt,* 106 B.R. 553, 561 (Bankr.N.D.Ind. 1989). *See, also, In re Williamson,* 296 B.R. 760, 764 (Bankr.N.D.Ill.2003). However, courts have nonetheless justified including the non-filing spouse's income in the Section 1325(b) equation on the theory that the non-filing spouse's income does have an effect upon what the debtor must expend from his or her own income for maintenance and support. In other words, the courts have reasoned that a married debtor should have more of his or her own income available to fund a Chapter 13 plan

if that debtor's non-filing spouse is also earning a living.

The courts have applied this rationale in one of two ways. Some courts have determined that all debtors and their non-filing spouses should be treated as quasi-partnerships whose incomes and expenses are pooled for purposes of assessing whether disposable income is available under Section 1325(b). *See, e.g., In re Williamson,* 296 B.R. at 764–65; *In re Bottelberghe,* 253 B.R. 256, 262–63. (Bankr.D.Minn.2000). However, other courts have limited the pooling concept to an assumption that married couples share only "joint" living expenses and that each pays half of whatever those expenses might be to the extent his or her net income permits. *See, e.g., In re Falke,* 284 B.R. at 138–39.[9] For example, a debtor and her non-filing spouse may have joint housing and food expenses of $2,000 per month. The *Falke* approach would eliminate $1,000 of these expenses from the debtor's budget if the non-filing spouse had sufficient income to cover his or her half of these joint expenses.[10]

I question the soundness of each approach. Treating a couple as a marital unit with pooled income and shared expenses seems anachronistic. Many couples today undoubtedly continue the tradition of both conjugal and financial partnership. However, times have changed. Dual incomes, second mar-

---

**9.** *Falke* is a Section 707(b) case. However, the discussion regarding the attribution of joint living expenses was in the context of considering the debtor's ability to pay under a hypothetical Chapter 13 plan and the cases cited in support of the method selected included Section 1325(b) cases.

**10.** *Falke* in turn suggests a third approach, for it is always possible that a particular couple may not share all common living expenses equally. For example, a particular couple

may have an arrangement whereby one spouse pays the mortgage out of his income and the other spouse pays for the food and utilities out of her income. Or another couple's arrangement might be that just one spouse pays all of the living expenses. Therefore, the third approach would presume that each spouse shares the common living expenses equally but then would allow the debtor to rebut that presumption.

riages, prenuptial agreements, and non-traditional living arrangements have all contributed to marital relationships where both spouses have reserved some degree of financial independence. Modern couples may agree to cover common expenses or even contribute to a household account. However, it is not unusual now for each spouse to also keep a separate account for his or her personal pursuits. Therefore, one can no longer simply accept as fact that a married couple will pool all income and expenses like a quasi-partnership or that a married couple will even share all household expenses, whatever that means, equally. At best, a court today can only presume that a married couple pools income and/or shares expenses. Each debtor must be given the opportunity to establish that his or her household is managed differently.

Unfortunately, a rebuttable presumption of shared income and/or expenses presents its own set of problems. The evidentiary issues are substantial. Married accountants and Quicken devotees might keep sufficient records for the court to sort out precisely how household expenses are allocated between the couple. However, few dual income households are managed that well. A more likely scenario is one where there is sufficient evidence to establish that all expenses are not shared equally but where there is not enough evidence to discern exactly how the expenses are in fact allocated.

A "pooling" presumption also ignores the dynamics of a Chapter 13 proceeding. A debtor and her non-filing spouse may have in fact pooled their income to cover all household expenses pre-petition. However, what is to stop the non-filing spouse from changing that arrangement upon his spouse's decision to seek Chapter 13 relief? In other words, cannot the non-filing spouse simply say to his debtor spouse that its up to you to now cover the mortgage, the utilities, etc.? Creditors and trustees respond with the argument that the debtor spouse should not be able to subsidize the non-filing spouse's lifestyle at the expense of her creditors. However, cannot the non-filing spouse respond in kind with the argument that it is not his responsibility to account for his wife's separate creditors?

The answer, of course, is that the non-filing husband should stand up and pay his share of fixed household costs such as the mortgage or rent, utilities, and real estate taxes. However, the Bankruptcy Code is grounded in law, nor moral imperative. As reprehensible as it may be, I am not aware of any Michigan law whereby one spouse can be compelled to support the other during the marriage. Lack of support is cause for divorce and divorce in turn may result in an order for support. However, a court cannot actually compel a recalcitrant husband to turnover a portion of his income to his spouse during the marriage nor can a court compel that husband to contribute to the couple's mutual living expenses. How, then, can a bankruptcy court conclude that a non-filing spouse's income must be included in the calculation of what the debtor spouse may reserve for her own support in the context of a Chapter 13 proceeding? [11]

---

11. The inclusion of the non-filing spouse's income into the Section 1325 calculation may also have unintended social consequences. A spouse's addictive behavior can add financial strains to a marriage that may already be quite fragile. Bankruptcy offers troubled couples the opportunity to remove the financial stress from their marriage so that they can focus upon repairing the other problems in their relationship. Is it appropriate, then, to reintroduce this stress through the Section 1325 disposable income test? A non-filing

There is also the question of fairness. Marriage is no longer a prerequisite for cohabitation. Does Section 1325(b) also require consideration of a "significant other's" contribution to the relationship? If yes, then at what point does the relationship transcend from mere infatuation to mutual dependence? Or should 1325(b) "pooling" even be limited to relationships involving cohabitation? Should parents who have been helping an adult son pre-petition be permitted to withdraw that support if the son elects to seek relief under Chapter 13? Or must the court hold that the son is not contributing all of his disposable income under Section 1325(b) unless the parents' historical support is factored into his ability to pay?

Creditors have rationalized including the non-filing spouse's income in the calculation of the debtor's disposable income because "it would be unfair to allow the debtor's separate income to be used for the family necessities and not count a non-filing spouse's income which would remain 'disposable' to the debtor and uncommitted to the plan." *In re Carter*, 205 B.R. 733, 736 (Bankr.E.D.Pa.1996). This argument has merit to the extent it applies to the incremental living costs associated with a non-filing spouse.[12] The debtor's creditors should not have to subsidize the non-filing spouse's incremental living expenses if the non-filing spouse is capable of paying for

them himself. Similarly, a debtor should not have to subsidize a dependent's incremental living expenses if the non-filing spouse is also obligated to support that dependent and is able to do so.

However, creditor's protestations about "fairness" are much less compelling when it comes to the question of what the bankrupt spouse should actually have to repay his or her creditors. After all, it is the debtor's creditors, not the non-filing spouse's creditors, who are being addressed through the debtor's Chapter 13 plan. Some of the bankruptcy spouse's creditors may have a legitimate claim to the non-filing spouse's income and assets because they had the foresight to include him as a co-signor or guarantor.[13] However, what claim do the bankrupt spouse's other creditors have to the non-filing spouse's income? Creditors who did not procure the non-filing spouses signature certainly could not make such a demand outside the context of a bankruptcy proceeding. Indeed, it would appear that the non-filing spouse and that spouse's creditors are the ones who should be complaining about fairness. Is it fair for the creditors of the bankrupt spouse to in effect force the non-filing spouse to indirectly fund his mate's Chapter 13 plan so that those creditors may be compensated for their own imprudent underwriting decisions?[14]

---

spouse's willingness to forgive a mate's addiction may be sorely pressed if the price includes having to reallocate his or her own income to accommodate the mate's responsibilities to fund a confirmable Chapter 13 plan.

**12.** Some of a debtor's living expenses are fixed regardless of whether another lives with the debtor. For example, the rent for a one-bedroom apartment is the same whether the debtor is single or married. However, other household expenses increase when a couple lives together. Two cars are required instead of one. Grocery bills, medical expenses, and recreation costs also get larger. The "incre-

mental cost" of a non-filing spouse is the difference between the cost of the debtor and the non-filing spouse living together and the cost of the debtor living alone.

**13.** These creditors would be subject to the Section 1301 co-debtor stay. However, that stay would be of no effect unless the debtor's plan provided for the payment of these creditors' claims. 11 U.S.C. § 1301(c)(2).

**14.** I also note that the recent BAPCPA amendments to Section 707 are consistent with my conclusion that a non-filing spouse's income

In the instant case, it is Ms. Welch, not her husband, who is seeking Chapter 7 relief. Granted, Mr. Welch himself has disposable income which he has contributed in the past to the family unit. However, the only income that Ms. Welch herself controls is the $2,251.06 per month she currently takes home from her own employment and, as already discussed, it is unlikely that these earnings would have precipitated a Section 707(b) motion had Ms. Welch been living on her own. Living on $2,251.06 per month does not put Ms. Welch under the poverty line. However, $2,251.06 per month is also certainly not sufficient to fund a lifestyle that could be described as "substantially abusive" within the meaning of Section 707(b).

■ Eliminating the non-filing spouse's income from the actual calculation of the debtor's Section 1325(b) disposable income does not mean that the non-filing spouse's income is altogether irrelevant with respect to either a Section 707(b) motion to dismiss or the confirmation of a Chapter 13 plan. A non-filing spouse's income will always be considered in connection with whether the bankrupt spouse should be subsidizing the incremental living costs of the non-filing spouse and the incremental living costs of any dependent of the non-filing spouse.

In addition, the debtor's budget must be adjusted to exclude "hidden" items that should be covered by the non-filing spouse or by some other source. For example, I do not assume that Ms. Welch's Quinnesec home is necessarily the appropriate resi-

dence for her. Ms. Welch and her husband's mortgage and utility payments are $1,297.00 per month. It is distinctly possible that there are other less expensive accommodations within the Iron Mountain area where she and her family could reside comfortably. More to the point, there may also be even less costly alternatives which could accommodate Ms. Welch were she to live on her own. If so, then it is the cost of this cheaper "single" accommodation which should be included in the calculation of what Ms. Welch requires from her own net income as her housing needs.

■ Finally, the court may always consider the non-filing spouse's income as part of the "totality of the circumstances." For example, in *In re Staub*, 256 B.R. 567 (Bankr.M.D.Pa.2000), the debtor's Chapter 7 was dismissed as a substantial abuse notwithstanding his own nominal income because his wife, who was not a debtor, earned over $16,000.00 of net income each month.

> I cannot simply ignore, as Debtor would have me do, the fact that he is married to a spouse whose disposable income is so great that it could pay off the entirety of his unsecured debt in a matter of months.
>
>  *  *  *  *  *  *
>
> The Debtor does not live in poverty. He does not complain of harassment from creditors threatening his peace of mind about his future. He does not appear to see his future as one of involuntary servitude. His bankruptcy peti-

---

is not to be included in determining whether the debtor's petition is abusive. For example, only the debtor's income is to be included in determining whether the Section 707(b)(2) presumption applies unless the debtor and his spouse filed jointly. 11 U.S.C. § 101(10A). Similarly, the spouse's needs are not to be included in the calculation of the debtor's expenses for purposes of the Section 707(b)(2)

presumption unless the spouse is in fact a dependent or the spouse joined in the debtor's petition. 11 U.S.C. § 707(b)(2)(A)(ii)(I).

Indeed, it is only in determining who may file a Section 707(b) motion and when the Section 707(b)(2) presumption may be used that the non-filing spouse's income is to be considered.

tion was not filed because of sudden illness, calamity, disability, or unemployment. His expenses include an unreasonable amount for his adult son's education. Debtor's schedule of expenditures was somewhat inflated and did not accurately reflect his true financial condition. (N.T. 17–22). Thus, under *Local Loan* and *Green, supra,* he is not truly in "need" of a fresh start, unburdened by his former debts, and the totality of circumstances indicates that to grant him a discharge would be to substantially abuse Chapter 7.

*In re Staub,* 256 B.R. at 571.

There can, then, be instances where it is appropriate to consider the non-filing spouse's income in conjunction with whether the debtor's Chapter 7 petition is abusive. However, this is not one of those instances. There is no question that Mr. Welch earns sufficient income to assist Ms. Welch with her financial difficulties were he to choose to do so. However, his income is not so great as to justify ignoring the reality that it is Ms. Welch, not Mr. Welch, who is seeking bankruptcy relief. The court will not allow Ms. Welch's income to be diverted to her husband or, for that matter, their son when her husband is himself quite capable of supporting his own needs and his son's needs. However, it is ultimately left for Mr. Welch to decide how his income is to be spent and the court must respect that right except in those rare instances like *Staub*.

### CONCLUSION

Therefore, for the reasons stated on the record, the United States Trustee's motion is denied. A separate order consistent with this opinion will enter.